UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------

AHMED KHALFAN GHAILANI,

                    Petitioner,                   08 cv 1190 (RJL)

    v.

ROBERT M. GATES,

                    Respondent.

-----------------------------------------------------------

### PETITIONER'S RESPONSE TO JULY 25, 2008 FILING STYLED "MOTION TO (1) STRIKE SCOTT L. FENSTERMAKER'S UNAUTHORIZED NOTICE OF APPEARANCE AS PETITIONER'S COUNSEL IN THIS MATTER, (2) NAME DAVID H. REMES AS PETITIONER'S COUNSEL IN THIS MATTER, AND (3) BAR MR. FENSTERMAKER FROM MAKING ANY FURTHER FILINGS HOLDING HIMSELF OUT AS PETITIONER'S COUNSEL IN THIS MATTER."

#### Preliminary Statement

On July 25, 2008, David H. Remes, Esq. filed papers styled "Motion to (1) Strike Scott L. Fenstermaker's Unauthorized Notice of Appearance as Petitioner's Counsel in This Matter, (2) Name David H. Remes as Petitioner's Counsel in This Matter, and (3) Bar Mr. Fenstermaker from Making Any Further Filings Holding Himself Out as Petitioner's Counsel in This Matter." This response and request for affirmative relief responds to Mr. Remes' July 25th submission and requests affirmative relief, as described below.

#### Request for Affirmative Relief

Petitioner requests the following affirmative relief: a ruling of this Court (a) ordering an evidentiary hearing, to be held at this Court in Washington, DC, at which the Court and the undersigned can question Petitioner regarding his choice of counsel, whether his decision is

1

knowing and voluntary, and permitting the undersigned to examine Colonel Steven H. David and Lt. Colonel Michael Acuff under oath; (b) in the alternative, holding a hearing at the United States Naval Station at Guantánamo Bay, Cuba at which this Court, or a referee designated by this Court, and the undersigned can question Petitioner regarding his choice of counsel, whether his decision is knowing and voluntary, and permitting the undersigned to examine Colonel Steven H. David and Lt. Colonel Michael Acuff under oath; or (c) as an alternative to (a) and (b) above, permitting the undersigned to take the sworn testimony of Petitioner at the United States Naval Station at Guantánamo Bay, Cuba regarding his choice of counsel, whether his decision is knowing and voluntary and to take the sworn testimony of Colonel Steven H. David and Lt. Colonel Michael Acuff in Washington, D.C.

Petitioner further requests that this Court issue (d) an Order of this Court directing Respondent to permit the undersigned to travel to Guantánamo Bay, Cuba to meet with Petitioner for a reasonable period of time or, in the alternative, to report to this Court the status of the undersigned's application for a top-secret security clearance; (e) a protective order that permits, among other things, the undersigned to correspond with Petitioner and other detainees at Guantánamo Bay, Cuba through the legal mail system currently in place for the purpose of facilitating communications between counsel and detainees at Guantánamo Bay, Cuba; (f) an Order of this Court directing that Respondent or his subordinates deliver 16 envelopes to Petitioner and Rahim al-Nashiri containing legal mail from the undersigned to Petitioner and Rahim al-Nashiri that were wrongfully returned to Scott L. Fenstermaker, Esq., on July 31, 2008, within 48 hours of the signing of this order; and (g) a writ of prohibition, pursuant to 28 U.S.C. §1361, prohibiting Respondent or any of his subordinates from referring war crimes charges

against Petitioner until Mr. Remes' July 25, 2008 application and Petitioner's motion for affirmative relief have been decided.

Finally, Petitioner also applies for an order permitting Petitioner to file privileged communications, submitted in support of the instant response and request for affirmative relief, under seal and *ex parte* for the Court's *in camera* review.

## Statement of Material Facts

A. Petitioner Authorizes The Undersigned As His Legal Representative

By letter dated October 20, 2007, Petitioner retained the undersigned ("Retained Counsel") to serve as his counsel. *See* August 4, 2008 Declaration of Scott L. Fenstermaker, Esq. ("Fenstermaker Declaration"), ¶ 4, Exhibit A. Since then, Petitioner has written other letters to Retained Counsel, dated April 10, 2008, April 16, 2008, May 12, 2008, and May 26, 2008, all of which expressed praise for Retained Counsel's actions on his behalf and firmly reaffirmed the existence of the attorney-client relationship between Retained Counsel and Petitioner. *See id.* By letters dated December 14, 2007 and March 31, 2008, Retained Counsel notified the government and members of the Office of Military Commissions, including Colonel Steven H. David, the head of the Office of the Chief Defense Counsel ("CDC") for the Office of Military Commissions, that Retained Counsel represented Petitioner. *See* Fenstermaker Declaration, ¶ 8, Exhibit B. Until the events described in the Remes' July 25th application, Retained Counsel's authority to act on Petitioner's behalf was unquestioned.

Although Retained Counsel has been retained by Petitioner since 2007, Retained Counsel has never met with Petitioner or spoken directly with him. The government has yet to

grant Retained Counsel the necessary security clearance that would permit such a visit.[1] Nor is Retained Counsel permitted to access the legal mail system. As a result, Retained Counsel's only means of communicating with Petitioner has been through written correspondence using the non-legal mail system. The only reply that Retained Counsel has received from Petitioner in response to one of Retained Counsel's letters was delivered to Retained Counsel nearly six months after Retained Counsel's letter had initially been sent.

B.  The Assignment of Detailed Military Counsel.

On or about April 24, 2008, Colonel David assigned Lt. Colonel Michael Acuff ("Appointed Military Counsel") as Petitioner's detailed military defense counsel.[2] *See* Fenstermaker Declaration, ¶ 14; July 22, 2008 Declaration of Colonel David ("David Declaration"), ¶ 2. Within two weeks of that assignment, and without obtaining or receiving Retained Counsel's permission, Appointed Military Counsel visited Petitioner at Guantánamo Bay and spoke with him at length. *See* Fenstermaker Declaration, ¶ 15, footnote 5.

Retained Counsel learned of Appointed Military Counsel's visit in a telephone call on May 12, 2008. *See* Fenstermaker Declaration, ¶ 15. During this conversation, Appointed Military Counsel informed Retained Counsel that he was not comfortable having Retained Counsel as a member of "[his] team." In substance, Appointed Military Counsel stated that he and some of his colleagues in the CDC found Retained Counsel to be ineffective in his prior

---

[1] Retained Counsel, who is a Distinguished Graduate and Graduate with Honors of the United States Air Force Academy, a graduate of the United States Air Force's prisoner of war training, an honorably discharged veteran of the United States Air Force, and who currently holds a secret security clearance, has had his top-secret security clearance application pending since March of 2008. The application approval process for Retained Counsel's top-secret security clearance is likely now on hold in light of Colonel David's claims, discussed below, that Retained Counsel no longer has any clients facing trial by military commission.

[2] According to 10 U.S.C. §948k(a)(3), "Military defense counsel for a military commission under this chapter shall be detailed as soon as practicable after the swearing of charges against the accused."

efforts to help the detainees and that Retained Counsel lacked the qualification, diligence and dedication necessary to adequately represent the detainees' cause. When probed, Appointed Military Counsel refused to identify the colleague(s) who expressed concerns about Retained Counsel or to describe what past efforts Retained Counsel had made on behalf of the detainees that had fallen short. Appointed Military Counsel admitted that he had no knowledge or information regarding any of Retained Counsel's failings, shortcomings, lack of diligence and qualifications.[3] *See id.* Appointed Military Counsel further informed Retained Counsel that Petitioner's military commissions' trial would likely last six months and that Retained Counsel would likely not have time to assist Petitioner for such an extended period. Retained Counsel assured him that this was not a problem. Appointed Military Counsel also stated that he was aware that Retained Counsel is a graduate of Harvard Law School and the United States Air Force Academy, adding, "Frankly Scott, I know you are smarter than me." Surprised by this remark, Retained Counsel assured Appointed Military Counsel that Retained Counsel's educational background was irrelevant to Petitioner's defense and that thoughts of relative intelligence never occurred to him. *See id.*

During this telephone conversation, Appointed Military Counsel informed Retained Counsel that anything that was discussed between he and Petitioner was "top secret" and that, as a result of Retained Counsel's not having a top secret clearance, Appointed Military Counsel could not discuss with Retained Counsel his recent conversations with Petitioner. *See id.*

---

[3] Civilian attorneys must be a member of the Pool of Qualified Civilian Defense Counsel (the "Pool") to practice before the Military Commissions. *See* Regulation for Trial by Military Commissions, Chapter 9-5(c). The Regulation for Trial by Military Commissions can be found at *http://www.defenselink.mil/news/Apr2007/Reg_for_Trial_by_mcm.pdf.* Retained Counsel has been a member of the Pool since the spring of 2005, with the exception of a brief period when the first Pool was disbanded and its members were required to reapply. Retained Counsel's reapplication was approved in August of 2007.

Appointed Military Counsel also informed Retained Counsel in substance that "if [Appointed Military Counsel] had wanted to have ended [Retained Counsel's] involvement in [Petitioner's] matter, [Appointed Military Counsel] could have done so."[4]  *See id.*  Retained Counsel understood this statement to mean that Appointed Military Counsel, by virtue of his ease of access to Petitioner, could have easily undercut Retained Counsel's status with Petitioner. *See id.*

C.  <u>Appointed Military Counsel's Conflict Of Interest.</u>

In addition to his assignment as military counsel to Petitioner, Appointed Military Counsel is also appointed to represent another detainee, Khalid Sheikh Mohammed.  *See* Fenstermaker Declaration, ¶ 16.  Mr. Mohammed, one of the most notorious alleged terrorists in the world, faces war crimes charges before a military commission stemming from his alleged role as the so-called "mastermind" of the September 11, 2001 terrorist attacks. *See id; see also http://www.defenselink.mil/pdf/detaineebiographies1.pdf,* page 13.

As described below, Retained Counsel's assessment of the allegations against Mr. Mohammed and Petitioner revealed an apparent conflict of interest in Appointed Military Counsel's simultaneous representation of both detainees.  As a result, Retained Counsel informed Appointed Military Counsel on or about May 19, 2008 that Appointed Military Counsel should review whether he was operating under a conflict of interest in violation of Petitioner's Sixth Amendment rights.  *See* Fenstermaker Declaration, ¶ 21.  In response, Appointed Military Counsel stated that while an appellate court might consider this Sixth Amendment concern, a military judge would not give such concern much credence. *See id.*

---

[4] Retained Counsel was not taking notes during this conversation and does not recall the exact wording of this statement.

6

Retained Counsel's conflict assessment is based on publicly-disclosed, government-provided information, including short biographies generated by the government for public release. According to a government-created biography of Petitioner, he allegedly was a document forger and travel facilitator for al Qaeda, who participated in the bombing of the United States embassy in Dar es Salaam, Tanzania in 1998. *See http://www.defenselink.mil/pdf/detaineebiographies1.pdf*, page 2. According to the government, Petitioner and several other operatives fled Afghanistan the day before the August 7, 1998 embassy bombings. After arriving in Afghanistan, Petitioner eventually became a cook for Osama bin Laden before joining a group of fellow Africans in 2001 who ran al-Qaeda's document forgery office in Kandahar, Afghanistan. *See id.* The government claims that Petitioner rose in stature after the September 11th attacks as one of al Qaeda's top forgers, working to substitute photos in passports and modifying visa stamps.[5] *See http://www.defenselink.mil/pdf/detaineebiographies1.pdf*, page 2. The government further claims that "[Petitioner] fled to Karachi, Pakistan, after the fall of the Taliban, but [that] high-profile arrests in Karachi in April 2003 convinced [Petitioner] to move to South Waziristan."[6] *See id.*

During his Combatant Status Review Tribunal ("CSRT") testimony, Petitioner acknowledged training in the Al Farouq al Qaeda training camp in Afghanistan after allegedly fleeing Tanzania on August 6, 1998. *See http://www.defenselink.mil/news/transcript_ISN10012.pdf*, page 11 of 19. Petitioner also acknowledged being in Afghanistan from 1998 through the United States invasion of

---

[5] The government's biography leads one to believe that Petitioner may be suspected of facilitating the September 11th attacks under Mr. Mohammed's direction.
[6] Indeed, one of these "high-profile" arrests was likely that of Mr. Mohammed.

Afghanistan in the fall of 2001. He further testified to having met Osama bin Laden and Mr. Mohammed during his stay in Afghanistan. *See id.*, pages 13, 15 and 16 of 19. After leaving Afghanistan, Petitioner traveled to Pakistan where he lived with a relative of Mr. Mohammed and prepared documents/passports for al Qaeda. *See id.*, pages 12, 15, and 16 of 19.

According to the United States' government's biography of Mr. Mohammed, Appointed Military Counsel's other client, Mr. Mohammed "was the driving force" behind the September 11, 2001 attacks as well as several subsequent plots against the United States and Western targets worldwide. *See http://www.defenselink.mil/pdf/detaineebiographies1.pdf*, page 13. Mr. Mohammed assumed the role of chief of external operations for al-Qaeda as a result of his success in the September 11th attacks. *See id.* The government claims that Mr. Mohammed was involved in a plan in early 2002 to send al-Qaeda operatives to oversee attacks in the United States. He is further implicated in a 2003 plot to employ a network of Pakistanis to smuggle explosives into New York to target gas stations, railroad tracks, and a bridge. *See id.*

According to the transcript of Mr. Mohammed's CSRT hearing, Mr. Mohammed claimed responsibility for, among other things, the 2002 beheading of Daniel Pearl, the December 22, 2001 so-called "Shoe Bombing Operation" perpetrated by Richard Reid, "the Filka Island Operation" on October 8, 2002, the October 12, 2002 nightclub bombing in Bali, Indonesia, the 2001/2002 plans to attack the "Library Tower," Sears Tower, Plaza Bank and the Empire State Building, the November 2002 destruction of an Israeli El-Al flight in Thailand, the September 2002 hotel bombing in Mombasa, and the November 2002 launching of a Russian-made SA-7 surface-to-air missile on El-Al airplanes in Mombasa. *See http://www.defenselink.mil/news/transcript_ISN10024.pdf*, pages 18 and 19 of 26.

As a result of Retained Counsel's conflict-of-interest assessment, he objected to Appointed Military Counsel's visits with Petitioner until the conflict of interest issue could be resolved. Retained Counsel initially notified Appointed Military Counsel and Colonel David, Appointed Military Counsel's superior. Retained Counsel's efforts were ignored.

Through e-mails dated May 27, 2008, June 1, 2008, June 9, 2008, June 18, 2008, and June 20, 2008, Retained Counsel informed Appointed Military Counsel and Colonel David that Appointed Military Counsel did not have "permission to meet with or otherwise communicate with [Petitioner]." *See* Fenstermaker Declaration, ¶¶ 24, 25, 27, 29 and 30, Exhibits F, G, H, J, and K. Retained Counsel urged Appointed Military Counsel to research the apparent conflict of interest issue. Retained Counsel further informed Appointed Military Counsel that "[s]hould you meet with, or otherwise communicate with [Petitioner] absent my written permission, I will raise my Sixth Amendment and Rules of Professional Conduct concerns again." Retained Counsel also raised concerns regarding the CDC's apparent attempt to interfere, on a systematic basis, with the detainees' choice of counsel as a matter of CDC policy. *See* Fenstermaker Declaration, ¶ 24, Exhibit F.

On June 18, 2008, Appointed Military Counsel sent an e-mail to Retained Counsel in which he informed Retained Counsel that Petitioner determined that there was no actual conflict of interest between Petitioner and Mr. Mohammed. *See* Fenstermaker Declaration, ¶ 28, Exhibit I.

On June 23, 2008, as a result of Appointed Military Counsel's failure to address Retained Counsel's conflict concerns, Retained Counsel wrote to Susan J. Crawford, the Convening Authority for the Office of Military Commissions and Brigadier General Thomas W. Hartmann, the Legal Advisor to the Convening Authority for the Office of Military

Commissions. In this letter, Retained Counsel explained to them his concerns about Appointed Military Counsel's apparent conflict of interest. *See* Fenstermaker Declaration, ¶ 31, Exhibit L. Shortly thereafter, Retained Counsel received a letter from General Hartmann informing Retained Counsel that it was General Hartmann's and Colonel David's position that Retained Counsel no longer represented Petitioner and that, as a result, Ms. Crawford would not discuss Petitioner's case with Retained Counsel.[7] *See* Fenstermaker Declaration, ¶ 31, Exhibit M.

   D.  Petitioner's Purported Decision to Proceed *Pro Se.*

According to Appointed Military Counsel, Petitioner's decision to act *pro se* was influenced by Petitioner's "daily contact" with another detainee, Ammar al-Baluchi.[8] On June 5, 2008, Mr. al-Baluchi appeared before a military commissions judge during an arraignment proceeding. At the arraignment, Mr. al-Baluchi charged that the government had obstructed his attempts to communicate with Retained Counsel by letter for the purpose of securing Retained Counsel's legal services.[9] Shortly thereafter, during the same proceeding, Mr. al-Baluchi and the other defendants present rejected military counsel and the civilian attorneys selected by military counsel and declared their intention to proceed *pro se*. According to Appointed Military Counsel, who was present at Mr. al-Baluchi's arraignment in his capacity as Mr. Mohammed's counsel, Petitioner's decision to proceed *pro se* "mirrored" Mr. al-Baluchi's, stating that Petitioner had been influenced by Mr. al-Baluchi to waive counsel and proceed *pro se* in his defense. *See* Fenstermaker Declaration, ¶ 28, Exhibit I. Retained Counsel immediately asked Appointed Military Counsel whether Petitioner had, at any point, asked to speak with Retained

---

[7] On July 28, 2008, Retained Counsel received a letter, worded almost identically, from General Hartmann's deputy Michael Chapman regarding Rahim al-Nashiri. Retained Counsel has two letters from Mr. al-Nashiri asking that Retained Counsel be his attorney and "next friend."
[8] Mr. al-Baluchi is also known as Ali Abdul Aziz Ali.
[9] Retained Counsel has received three of Mr. al-Baluchi's five letters.

Counsel. *See* Fenstermaker Declaration, ¶¶ 29 and 30, Exhibits J and K. Appointed Military Counsel never responded. *See id.*

   E. Respondent has Eliminated Privileged Communications To and From Petitioner

   On July 1, 2008, Retained Counsel received an e-mail from Andrew I. Warden, who apparently represents Respondent in a number of actions related to Guantánamo Bay. Mr. Warden's e-mail announced, for the first time, that Retained Counsel's correspondence with Guantánamo Bay detainees would not be treated as privileged. *See* Fenstermaker Declaration, ¶ 32, Exhibit N. The address used in the mail to which Mr. Warden referred is the same address Retained Counsel had been using for the past 13 months without objection or notification of impropriety. Retained Counsel was given this mailing address by an assistant United States attorney ("AUSA") in the Southern District of New York during Guantánamo Bay-related litigation. *See* Fenstermaker Declaration, ¶ 33. That AUSA provided this address as evidence to the court that Retained Counsel had unfettered ability to send legal-related mail to detainees at Guantánamo Bay. *See id.* Previous mail to the same detainees, similarly marked as privileged, generated no such government attention. *See* Fenstermaker Declaration, ¶¶ 37 and 38.

   Later that same day, Retained Counsel responded to Mr. Warden's e-mail. *See* Fenstermaker Declaration, ¶34, Exhibit O. In that e-mail, Retained Counsel informed Mr. Warden that "[y]ou are free to process my mail to my clients in whatever fashion you like, *so long as they get it*. I will reserve my arguments regarding the privileged nature of the correspondence for the appropriate forum." (Emphasis added). Mr. Warden never responded to this direction.

   On July 31, 2008, Retained Counsel received a package from the Office of the Staff Judge Advocate at Guantánamo Bay. In that package were 16 envelopes of attorney-client

correspondence from Retained Counsel to Petitioner and Rahim al-Nashiri, delivery of which was rejected by Respondent's subordinates and returned to Retained Counsel. *See* Fenstermaker Declaration, ¶ 35, Exhibit P. Included in that package was a memorandum from Major Greg Musselman, JAGC, USA. Major Musselman explained that the Office of the General Counsel of the Department of Defense advised the Office of the Staff Judge Advocate at Guantánamo Bay to return the 16 envelopes to Retained Counsel because of its privileged labeling.

The rejected mail in question constitutes privileged attorney-client correspondence to Petitioner and Rahim al-Nashiri, Retained Counsel's two clients detained at Guantánamo Bay. The mail was addressed to the following detainees and postmarked as follows: Petitioner, May 28, 2008; Petitioner, June 21 (2 envelopes); Petitioner, June 24, 2008 (3 envelopes); Petitioner, June 28, 2008 (3 envelopes); Petitioner, June 30, 2008 (2 envelopes); Petitioner, July 7, 2008; Mr. al-Nashiri, June 17, 2008 (2 envelopes).[10]

Prior to receiving Major Musselman's memo, Retained Counsel had been using the address to which the above mail was sent for the past 13 months in communicating with Guantánamo Bay detainees. *See* Fenstermaker Declaration, ¶ 38. During this 13-month period, Retained Counsel has written numerous letters addressed to many detainees using this address. Each of these letters was marked "Privileged and Confidential" and "Attorney/Client Privilege." Retained Counsel has received numerous letters and postcards from many detainees in response to these letters. Mr. Warden's July 1st e-mail was the first indication that Retained Counsel received that his correspondence was not being treated as privileged (other than the fact that some of the letters and postcards he received from detainees contained redactions, which he understands is permissible even with legal mail sent pursuant to applicable protective orders).

---

[10] Duplicate letters were sent to the detainees the same day because Retained Counsel sends all correspondence to all detainees to three separate addresses.

*See* Fenstermaker Declaration, ¶ 38.  Neither the general counsel for the Department of Defense nor his staff has contacted Retained Counsel regarding this issue.  Retained Counsel has never received a response to his July 1, 2008 e-mail to Mr. Warden.

**ARGUMENT**

**Point I**

**Mr. Remes' Application Calls for an Unprecedented Violation of Separation of Powers and Calls into Question the President's Power to Involve the Military in Civilian Affairs**

Appointed Military Counsel's interference with the instant action, a civilian court proceeding designed to test the validity of Respondent's military detention of Petitioner, is entirely unauthorized.  Here, a civilian attorney, Mr. Remes ("Subordinate Civilian Counsel") has been directed by a commissioned officer in the United States military (Appointed Military Counsel), to seek the removal of a military detainee's counsel of choice in a matter pending before a civilian court.  By employing Subordinate Civilian Counsel as his agent to file the instant motion to substitute Subordinate Civilian Counsel as counsel of record in the instant *habeas* matter, Appointed Military Counsel's action violates the separation of powers doctrine.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("[T]he Constitution diffuses power the better to secure liberty."); *Loving v. United States*, 517 U.S. 748, 756 (1996) ("Even before the birth of this country, separation of powers was known to be a defense against tyranny"); *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers").  The Supreme Court recently reaffirmed these basis principles.  *See Boumediene v. Bush*, 128 S.Ct. 2229, 2246 (2008) ("The framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers

13

among three independent branches.    This design serves not only to make Government accountable but also to secure individual liberty.").    Appointed Military Counsel's unprecedented direction to Subordinate Civilian Counsel, given by one of Respondent's subordinate officers, and Subordinate Civilian Counsel's troubling application made pursuant thereto, raise ethical, constitutional, and practical issues.    The Court should not countenance Respondent's unlawful attempt to bypass Petitioner's right to counsel of his choice by supplanting Retained Counsel with Subordinate Civilian Counsel.

Clearly, Congress and the President provided certain limited authority to Appointed Military Counsel.    *See* 10 U.S.C. §§948k(a)(1), (3), and (c).    Similarly, Rules 502(d)(2) and (6) the Rules for Military Commissions, [11] and Chapter 9-1(b) of the Regulations for Trial by Military Commission,[12] provide limited authority for Appointed Military Counsel to act within the realm of the military commissions' process.[13]    However, neither the Military Commissions Act, the Rules for Military Commissions, nor the Regulations for Trial by Military Commissions provides for any responsibility or authority, of any nature, for military counsel to act in a civilian court proceeding, particularly where the proceeding is a *habeas* petition challenging Respondent's detention of Petitioner in his capacity as the United States Secretary of Defense.[14] *See Hamdan v. Rumsfeld*, 548 U.S. 557, 602 (2006) (permitting Appointed Military Counsel to

---

[11] The R.M.C. can be found at *www.defenselink.mil/news/d20080213rules.pdf*.

[12] The    Regulations    for    Trial    by    Military    Commission    can    be    found    at *http://www.defenselink.mil/news/Apr2007/Reg_for_Trial_by_mcm.pdf*.

[13] These same rules clearly provide that Appointed Military Counsel is to act in a subordinate capacity to Retained Counsel.    *See*  10 U.S.C. 949c (b) (5) ("If the accused is represented by civilian counsel, detailed military counsel shall act as associate counsel"); *see also* Rule 502(d)(2) of the Rules for Military Commissions ("R.M.C."); *see also* Rule 502(d)(6) of the R.M.C.; *see also* ¶(F) of the Discussion to Rule 502(d)(6) of the R.M.C.; *see also* Chapter 9, section 9-1, ¶b(2)(C) of the Regulation for Trial by Military Commissions.

[14] Indeed, if Appointed Military Counsel was given explicit authority in civilian venues, it would raise troubling separation of powers issues and would be unprecedented in our nation's history.

14

so act "would be to risk concentrating in military hands a degree of adjudicative and punitive power in excess of that contemplated either by statute or by the Constitution"). Appointed Military Counsel's decision to use Subordinate Civilian Counsel as his surrogate herein is an implicit admission of Appointed Military Counsel's recognition of his circumscribed authority.

Nor does Subordinate Civilian Counsel alone have authority to file the instant application on Petitioner's behalf. Here, Subordinate Civilian Counsel is seeking an order of this Court removing Petitioner's chosen civilian attorney, Retained Counsel, as counsel of record herein, based solely upon nothing but the declarations of two commissioned officers in the United States military, Appointed Military Counsel and his superior, Colonel David. More specifically, Subordinate Civilian Counsel provides no indicia of authority directly from Petitioner. Indeed, Subordinate Civilian Counsel admits that his authority stems solely from Appointed Military Counsel's selection and remains subject to Petitioner's approval, to be determined after Petitioner's meeting with him directly. Petitioner's hesitation is unsurprising, given that Subordinate Civilian Counsel has apparently never met with, spoken with, corresponded with, or otherwise directly interacted with Petitioner at any level. Under the circumstances, Subordinate Civilian Counsel's authority stems purely from his having been selected, by Appointed Military Counsel, to assist Appointed Military Counsel in his representation of Petitioner before the military commissions, which in a civilian context, is no authority at all.

Were this application made in a military court or martial tribunal, it would be troubling enough. Here, however, the matter before this Court is a petition for a writ of *habeas corpus*, a *civilian* court action brought by Retained Counsel, seeking to challenge the legality of Respondent's actions in continuing to hold Petitioner in military detention. Under these

15

circumstances, Subordinate Civilian Counsel's application, filed at the behest of a member of the United States military, and who, as such, is a subordinate of Respondent in his capacity as the United States Secretary of Defense, is nothing short of shocking.

On a practical level, this Court should exercise caution in permitting uniformed military officers to play a role in selecting counsel for military detainees, particularly where, as here, Petitioner has expressed an explicit preference for civilian counsel. *See Hamdan*, 548 U.S. at 638 ("Concentration of power puts personal liberty in peril of arbitrary action by officials, an incursion the Constitution's three-part system is designed to avoid) (Breyer, J., concurring); *see also* Fenstermaker Declaration, Exhibit A. Here, Respondent, as head of the United States military, not only detains Petitioner but, as described in detail below, also exercises complete control over Retained Counsel's access to, and communications with, Petitioner. By permitting Appointed Military Counsel's surrogate, Subordinate Civilian Counsel to supplant Retained Counsel, who is Petitioner's civilian counsel of choice under the circumstances presented here, the Court would effectively give military personnel oversight over the selection of counsel of a military detainee who seeks to challenge his detention by the military in civilian courts. Such a ruling would, in effect, grant the military unprecedented authority in our civilian court system and would present a chilling circumstance in our system of ordered liberty. The potential for abuse is abundantly clear.

## Point II

### Retained Counsel has Never Been Properly Relieved by Petitioner Who Has Affirmed Each of Retained Counsel's Actions

As detailed below, Retained Counsel is authorized to proceed as Petitioner's legal representative in spite of claims by Appointed Military Counsel and Colonel David to the

contrary, as their claims are the direct result of the government's violation of Petitioner's Sixth Amendment right to counsel of his choice and Fifth Amendment right to due process of law. First, Retained Counsel, whose October 2007 retention by Petitioner remains undisputed, has received no confirmation of termination directly from Petitioner or other credible source. Second, the wholesale rejection by detainees at Guantánamo Bay of their military attorneys and the civilian attorneys designated by those military attorneys did not include a rejection of Retained Counsel.    Third, claims by Appointed Military Counsel and Colonel David that Petitioner has terminated Retained Counsel as his legal representative are highly suspect given the circumstances surrounding the tension between Retained Counsel, Appointed Military Counsel, and the CDC.  Finally, permitting Respondent to hold Petitioner incommunicado from his chosen counsel for the apparent purpose of supplanting Retained Counsel with Appointed Military Counsel and Subordinate Civilian Counsel is nothing short of a shocking encroachment by the United States military on civilian judicial matters, such as this *habeas* petition challenging the military's detention of Petitioner, and must be rejected by this Court.

      A.  Petitioner's Letters Authorized Retained Counsel To Act.

      Initially, by Petitioner's October 20, 2007 letter to Retained Counsel, he unequivocally retained Retained Counsel.  *See* Fenstermaker Declaration, ¶ 4, Exhibit A.  This letter and Retained Counsel's agreement to serve as Petitioner's legal representative establish an attorney-client relationship. *See Nelson v. Kalathara*, 48 A.D.3d 528 (2d Dept. 2008) ( "an attorney-client relationship does not depend on the existence of a formal retainer agreement or upon payment of a fee, a court must look to the words and actions of the parties to ascertain the existence of such a relationship") (*citing Hansen v. Caffry,* 280 A.D.2d 704 (3 Dept. 2001) and *Tropp v. Lumer*, 23 A.D.3d 550 (2 Dept. 2005)); *see also Pellegrino v. Oppenheimer & Co.*, 49

A.D.3d 94 (1st Dept. 2008). Petitioner's four subsequent letters to Retained Counsel further evidence the existence of this relationship. *See* Fenstermaker Declaration, ¶ 4, Exhibit A.

To require more evidence of the existence of an attorney-client relationship would be unreasonable, particularly under the unique circumstances Petitioner faces. Petitioner is being held by Respondent, who, as Secretary of Defense, is Appointed Military Counsel's civilian superior, in an arguably unprecedentedly coercive environment. Petitioner has been held in the custody of the United States government for over four years and may have been subjected to extremely harsh physical and psychological treatment at the hands of the United States government. These conditions are further exacerbated by the prohibitive communication restrictions imposed upon the detainees and those with whom they wish to communicate.[15] Those unauthorized to use the legal mail system must communicate with the detainees through the non-legal mail channels and agree to subject the contents of their communication to governmental review, redaction, and screening in a non-privileged forum. *See Bismullah v. Gates*, 501 F.3d 178, 188-192 (D.C. Cir. 2007), *vacated and remanded on other grounds*, 2008 U.S. LEXIS 5081 (detailing the difficulties in communicating with detainees at Guantánamo Bay). Furthermore, sending legal mail through non-privileged channels raises ethical concerns for any attorney. *See* New York Disciplinary Rules, Rule 4-101 (duty to preserve client confidences).

---

[15] Here, Petitioner and Rahim al-Nashiri arguably face unique communication hurdles. Respondent and his subordinates refuse to permit Petitioner's and Mr. al-Nashiri's chosen counsel to send them privileged communication. *See* Fenstermaker Declaration, ¶¶ 32, 33, 34, 35, and 36, Exhibits N and P. Similarly, Respondent and his subordinates wholly control Retained Counsel's ability to secure the necessary security clearance to send mail through the "legal mail" system in place. *See* Fenstermaker Declaration, ¶¶ 40, 41, and 42. In essence, Petitioner is forbidden from receiving privileged mail from his attorney. This remarkable situation is unprecedented and is a clear violation of Petitioner's Fifth and Sixth Amendment rights.

Similarly, physical access to the detainees, including Petitioner, is limited. Only those granted the necessary security clearance by the government are permitted to visit them at Guantánamo Bay. *See* Fenstermaker Declaration, ¶¶ 9, 10, and 11; *see also Bismullah, supra.* Under these circumstances, Petitioner's October 20, 2007 letter, and Retained Counsel's responses thereto, established an attorney-client relationship.[16] Nothing more is required. Not surprisingly, no government agent has ever disputed the existence of an attorney-client relationship between Petitioner and Retained Counsel prior to Appointed Military Counsel's June 18, 2008 e-mail announcing Petitioner's intent to proceed *pro se.*

B.  Petitioner Never Rescinded Retained Counsel's Authority.

(1) Retained Counsel Received No Verification Terminating His Services.

Subordinate Civilian Counsel's contention that Petitioner terminated Retained Counsel as his legal representative lacks merit for several reasons. Initially, Retained Counsel's authority was never rescinded by Petitioner. His failure to do so negates Subordinate Civilian Counsel's contention to the contrary. As described earlier, Petitioner has never hesitated to write to Retained Counsel. Having received no written or otherwise untainted confirmation from Petitioner that Petitioner had terminated Retained Counsel's services, Retained Counsel's choice to proceed as before was Retained Counsel's only viable option. With no written verification directly from Petitioner himself to substantiate claims that such termination, if it had occurred, was a knowing and voluntary decision, Retained Counsel is obligated to proceed under

---

[16] Retained Counsel first notified the government of this relationship by letter dated December 14, 2007. Until June 18, 2008, no agent of the government ever objected to Retained Counsel's assertion that he represented Petitioner. This six-month period of time is clear evidence of the government's acceptance of Retained Counsel's assertions.

Petitioner's last direction, that he act as Petitioner's representative and that he file a DTA petition.[17]

In support of his contention, Subordinate Civilian Counsel has submitted the sworn declarations of Appointed Military Counsel and his superior, Colonel David, claiming that Petitioner has become "very upset" with Retained Counsel stemming solely from a single event. According to the declarations Subordinate Civilian Counsel submitted, Petitioner became "very upset" during his early July 2008 meetings with Appointed Military Counsel, supposedly over Retained Counsel's decision to initiate a *habeas* action on his behalf. A close examination of these supporting declarations reveals nothing more than conclusory and self-serving statements interpreting Petitioner's words and conduct.[18]

First, neither declaration provides direct proof of Petitioner's desires to terminate Retained Counsel or evidence that they were the product of a knowing and voluntary decision. Notably absent from Subordinate Civilian Counsel's filings is any affidavit or other writing from Petitioner. Similarly absent from the declarations is any direct quote from Petitioner. With no information or direct quote attributed directly from Petitioner, this Court cannot assess the accuracy of the declarants' conclusory statements; it can therefore make no factual finding supporting the granting of Subordinate Civilian Counsel's July 25th application.

---

[17] Although Petitioner did not directly authorize Retained Counsel's filing a *habeas* petition, Petitioner's most recent letter to Retained Counsel was written prior to the Supreme Court decision in *Boumediene*. The *Boumediene* decision rendered the filing of the *habeas* petition a reasonable one and one that is implicitly authorized, particularly when viewed in conjunction with Petitioner's prior direction that Retained Counsel file a DTA petition.

[18] Indeed, as Petitioner's native language is Swahili, and neither Appointed Military Counsel nor Colonel David apparently speaks Swahili, it is unclear what Petitioner thinks he communicated to Appointed Military Counsel and Colonel David when he was "upset," due to this language barrier.

Indeed, Subordinate Civilian Counsel's application and its supporting documentation evidence Petitioner's satisfaction with Retained Counsel's services. While Subordinate Civilian Counsel claims the termination stemmed from Retained Counsel's unauthorized continued representation of Petitioner with the initiation of a *habeas* proceeding on his behalf, a closer review of Petitioner's behavior and responses belies that claim. By Appointed Military Counsel's own admission, Petitioner has ratified every action taken by Retained Counsel during the period that Appointed Military Counsel and Colonel David claim Petitioner was proceeding *pro se*. *See* Appointed Military Counsel Declaration, ¶¶ 7 and 8. Neither declaration supplied by Subordinate Civilian Counsel provides any factual explanation for why Petitioner would be "very upset" with Retained Counsel for this one incident, particularly where the filing of a *habeas* action was clearly ratified by Petitioner. Where nothing else occurred to "upset" Petitioner in the period between Petitioner's May letters, wherein Petitioner extolled Retained Counsel's representation, and July 16, 2008, the date on which Petitioner supposedly terminated Retained Counsel's authority, the declarants' conclusions that Petitioner had terminated Retained Counsel appear to lack credibility.

(2) Petitioner's Brief Stint as a *Pro Se* Litigant Did Not Negate Retained Counsel's Authorization to Act on His Behalf.

Subordinate Civilian Counsel also claims that Petitioner's act in proceeding *pro se* terminated Retained Counsel's authority and that such termination was reiterated during Appointed Military Counsel's and Colonel David's unauthorized July 16, 2008 meeting with Petitioner. Petitioner's alleged short stint as a *pro se* defendant, however, in no way undermines Retained Counsel's assertion of continued authority. When Petitioner's alleged decision to proceed *pro se* is read in its appropriate context and against the backdrop of the September 11th

21

defendants' decision to proceed similarly, that decision supports Retained Counsel's contention of continued authority.

To begin, Subordinate Civilian Counsel's claims ignore the simple truth that the detainees' rejection of military counsel stems not from their desire to represent themselves, but from their understandable frustration with their lack of access to independent civilian counsel. *See* Fenstermaker Declaration, ¶¶ 6, 9, 10, 11, 26, 32, 35, 37, and 38.  Similarly, the policy of the CDC to isolate detainees from independent counsel, described further below, is likely not lost on the detainees.

Petitioner's fleeting stint as a *pro se* defendant followed closely on the heels of events occurring on June 5, 2008.  At his arraignment on June 5, 2008, Ammar al-Baluchi, one of the September 11th defendants, complained to the judge that he had been stymied by the government in his attempts to contact Retained Counsel, apparently for the purpose of discussing Retained Counsel's availability to serve on his defense team.  *See* Fenstermaker Declaration, ¶26; *see also http://us.ft.com/ftgateway/superpage.ft?news_id=fto06092008124437393&page=2.*

Specifically, Mr. al-Baluchi complained that the government had prevented his letters from reaching independent counsel, namely, Retained Counsel.[19]  Apparently out of frustration over

---

[19] Retained Counsel received only three of Mr. al-Baluchi's five letters.  In addition to letters from Mr. al-Baluchi, Retained Counsel has received letters from other detainees held at Guantánamo Bay seeking his assistance either as counsel or as help in locating other independent counsel.  Retained Counsel has received inquiries from Messrs. Rahim al-Nashiri, Mohd Narir bin Lep, Abu al-Farraj al-Lybea (aka Abu Faraj al-Libi), Abu Zubaydah, Mohd Farik bin Amin, and Mustafa bin-Ahmed Hawsawi.  That the detainees' efforts to secure independent counsel are impeded by the government is further corroborated by the following occurrence.  In Retained Counsel's efforts to assist the detainees, he contacted Mr. Michael Berrigan, the Deputy CDC. Not only did Mr. Berrigan refuse to inform Retained Counsel of the identities of members of the Pool, but he also refused to disclose the number of attorneys in the Pool.  *See* Fenstermaker Declaration, ¶ 11.  Mr. Berrigan remarkably explained this refusal by replying that such information would give Retained Counsel an "unfair advantage in representing the detainees." When Retained Counsel inquired about this astonishing conclusion, Mr. Berrigan hung up the

the government's interference with their ability to obtain independent counsel, all five September 11th detainees, led by Mr. al-Baluchi, chose to reject assigned military counsel and the civilian attorneys they selected.   In other words, with no independent counsel immediately available because of the government's interference in the detainees' ability to retain them, they were left with very limited options.  The remaining choice available to them was to either accept military counsel and their civilian attorney designees, or to proceed *pro se* without them.  Their mistrust stemming from the military's association with the government and the civilian attorneys' tainted association to the military as a result of the selection process, left the detainees dissatisfied with this option.  Because proceedings against them by the government were clearly underway, and no additional time was left to secure independent counsel, the detainees were left with the only remaining option, that is, to proceed *pro se*.   Therefore, with their written attempts to secure independent civilian counsel thus stymied by government interference, Mr. al-Baluchi and the other detainees protested by rejecting their assigned attorneys, both military and civilian,[20] and announced their intention to proceed *pro se*.

---

phone. *See* Fenstermaker Declaration, ¶¶ 10 and 11.  The Pool, which purportedly exists as a resource for the detainees, is being misused by the CDC as a resource for the military attorneys assigned to the CDC.   Rahim al-Nashiri, another detainee has similarly retained Retained Counsel to serve as his attorney and "next friend."  However, on July 28, 2008 Retained Counsel received a letter from Michael Chapman, General Hartmann's deputy, informing Retained Counsel that the CDC was taking the position that Retained Counsel does not represent Mr. al-Nashiri.  Mr. Chapman provided no factual support for this assertion.  Mr. al-Nashiri has sent Retained Counsel two letters in which he clearly asked Retained Counsel to serve as his attorney and "next friend."

[20] It may appear to detainees that civilian counsel, like Messrs. Remes and Coyne, who are selected after a careful vetting process by military counsel, answer to military counsel, not the detainees, particularly where the CDC is treating the Pool as a resource for itself, and not the detainees.   *See* Fenstermaker Declaration, ¶¶ 10 and 11.  Civilian attorneys selected by the various appointed military counsel owe their position and standing to military counsel, not the clients.  This fact is not lost on the detainees.  As a result, the detainees have decided, as a group, to reject counsel because their counsel-of-choice are not available as a result of aggressive

23

These events were substantially corroborated by Appointed Military Counsel, who was physically present during the June 5th arraignment. *See* Fenstermaker Declaration, ¶ 28, Exhibit I. As Appointed Military Counsel's June 18, 2008 e-mail shows, Petitioner's choice to act *pro se* "mirrored" that of Mr. al-Baluchi. According to Appointed Military Counsel, Mr. al-Baluchi and Petitioner were in daily contact with one another at that time and provided the impetus for his decision to proceed *pro se*. Clearly then, Petitioner's decision to proceed *pro se*, like Mr. al-Baluchi's, stems from a frustration at having his communication with, and access to, Retained Counsel impeded, and was *not* the result of a desire to terminate the services of Retained Counsel. After all, not only did Petitioner retain Retained Counsel long before any military attorney was assigned to represent Petitioner, but Retained Counsel was the very attorney the detainees were seeking to contact, only to be frustrated by the government's policy of interference.[21] Therefore, while Appointed Military Counsel correctly concluded that his own authority was terminated by Petitioner's decision to act *pro se*, his conclusion that Retained Counsel's authorization was also terminated is simply wrong in light of the circumstances that engendered that decision and Appointed Military Counsel's and Colonel David's involvement therein. Petitioner's brief decision to proceed *pro se* resulted from his rejection of Assigned Military Counsel and civilian attorneys selected by Appointed Military Counsel, that is, Subordinate Civilian Counsel and Mr. Coyne. This decision left intact Retained Counsel's

---

government interference and obstruction. Fenstermaker Declaration ¶ 31, 32, 33, 34, 35, and 36; fns. 15 and 19 herein.

[21] Retained Counsel asked Appointed Military Counsel, on both June 18, 2008 and June 20, 2008, whether Petitioner had asked about him. *See* Fenstermaker Declaration, ¶¶ 29 and 30, Exhibits J and K. Appointed Military Counsel ignored both requests for information. His refusal to respond to these inquiries further supports Retained Counsel's belief that he is using these events to circumvent Petitioner's right to choice of counsel. The government's recent rejection of Retained Counsel's sixteen sets of correspondence to his two Guantánamo Bay-based clients further corroborates the deliberate interference by the government with communications between Retained Counsel and the detainees, including Petitioner.

authorization to proceed as before.  Under these circumstances, Retained Counsel's choice to proceed was not only reasonable, but required.  *See* New York Disciplinary Rules 6-101 (duty of competency) and 7-101 (duty of zealous representation).

> (3) Subordinate Civilian Counsel's Claim of Termination Is Grounded In Biased Information.

In support of his claim of Retained Counsel's termination, Subordinate Civilian Counsel submits the declarations of two witnesses, Appointed Military Counsel and Colonel David, both of whom have demonstrated bias against Retained Counsel's participation in Petitioner's defense.  Here, Appointed Military Counsel made clear to Retained Counsel on May 12, 2008 that Appointed Military Counsel did not want Retained Counsel as a member of "his team."  *See* Fenstermaker Declaration, ¶ 15.  The relationship further deteriorated when Appointed Military Counsel ignored his role as "associate counsel" subordinate to Retained Counsel and sought instead to assume the role of lead counsel, in contravention of the rules of the Military Commissions Act ("MCA"), the Regulations for Trial by Military Commissions and the Rules for Military Commissions. These rules dictate that Appointed Military Counsel is to serve as subordinate counsel to Retained Counsel.  *See* Fenstermaker Declaration, ¶23, Exhibit E; *see* 10 U.S.C. 949c (b) (5) ("If the accused is represented by civilian counsel, detailed military counsel shall act as associate counsel"); *see also* Rule 502(d)(2) of the Rules for Military Commissions ("R.M.C."); *see also* Rule 502(d) (6) of the R.M.C.; *see also* ¶(F) of the Discussion to Rule 502(d)(6) of the R.M.C.;[22] *see also* Chapter 9, section 9-1, ¶b(2)(C) of the Regulation for Trial by Military Commissions.[23]  Indeed, by letter dated May 21, 2008,

---

[22] The R.M.C. can be found at *www.defenselink.mil/news/d20080213rules.pdf.*
[23] The Regulations for Trial by Military Commission can be found at *http://www.defenselink.mil/news/Apr2007/Reg_for_Trial_by_mcm.pdf.*

Appointed Military Counsel defiantly announced his refusal to abide by these rules. *See* Fenstermaker Declaration, ¶23, Exhibit E.

Appointed Military Counsel's clear violation of Petitioner's Fifth and Sixth Amendment rights to due process of law and right to counsel of his choice further casts doubt on the objectiveness of his assertions. Specifically, by his manipulation of the military's already restrictive rules regarding access to detainees and his direct participation, as a government employee, in interfering with Retained Counsel's relationship with Petitioner, Appointed Military Counsel has violated Petitioner's basic rights. *See People v. Moore*, 57 Cal. App. 3d 437, 442 (Cal. App. 4th Dist. 1976) (prosecution's interference with an attorney-client relationship); *see also Commonwealth v. Manning*, 373 Mass. 438, 443 (1977) ("deliberate and intentional attack by government agents on the relationship between Manning and his counsel"); *United States v. Irwin*, 612 F.2d 1182 (9th Cir. 1980), citing *Moore* and *Manning*. Such action renders his supporting statement, and that of his superior, Colonel David, entirely suspect.

Initially, the government has interfered with Petitioner's attorney-client relationship by unnecessarily delaying Retained Counsel's security clearance that would permit him to visit Petitioner at Guantánamo Bay. Moreover, by relegating Retained Counsel's access to Petitioner to letter-writing sent through the non-legal mail channels,[24] despite the CDC's recognition of Retained Counsel as Petitioner's attorney, the government has deprived Retained Counsel of his ability to effectively communicate with his client. Similarly, as a government employee, Appointed Military Counsel's actions in his repeated admonition to Retained Counsel that he is not cleared to meet Petitioner, his claim that he may not divulge any of Petitioner's

---

[24] Indeed, it would appear that the government has essentially precluded Retained Counsel's ability to disseminate legal advice to the detainees. In so doing, the detainees' ability to solicit representation by any independent counsel is similarly impeded in that such solicitation is also privileged communication between the detainee and the prospective attorney of choice.

26

communications to Retained Counsel because of his lack of security clearance, however unrelated to classified information the communications may be,[25] and his argument that, as the only person who has spoken to Petitioner, he should lead the defense efforts, are all examples of his acting as an agent of the government in perfecting that violation in violation of the Constitution, MCA, and rules and regulations promulgated pursuant thereto.

Federal courts have cautioned against less nefarious government interference in attorney-client relationships where that governmental action caused the destruction of a defendant's confidence in his attorney. *United States v. Amlani*, 111 F.3d 705, 711 (9th Cir. 1997) (prosecutor's repeated disparagement of defense counsel). The *Amlani* court held that a change in defense counsel caused by governmental misconduct is so egregious as to constitute grounds for a vacatur of conviction. *Id.* at 710; *see also Cinelli v. Cutillo*, 896 F.2d 650, 655 (1st Cir. 1990) (defense counsel termination as result of denigration by the police); *see also United States v. Morrison*, 449 U.S. 361, 364 (1981) (DEA agents's disparagement of counsel). Here, the government action implicated is far worse. Not only did Appointed Military Counsel's actions effect those violations through conduct already described, but by Colonel David and the CDC's choice to inform both the legal advisor to the military commissions and his deputy that

---

[25] Interestingly, while Appointed Military Counsel claims that *all* of Petitioner's verbal communications to him, who is Retained Counsel's former co-counsel, are deemed "top-secret," despite its unclassified and likely mundane nature, Petitioner's written correspondence to Retained Counsel is not, as evidenced by the mail Retained Counsel has received from Petitioner since October of 2007, which the government has permitted to be delivered to Retained Counsel. Indeed, a review of Petitioner's letters to Retained Counsel shows that information regarding this very subject, that is, Petitioner's desire to see Retained Counsel, is entirely permitted in writing, while similar discussion, according to Appointed Military Counsel, may not be divulged when orally made by Petitioner to Appointed Military Counsel. Under these circumstances, the government's rule, whether Respondent's or Appointed Military Counsel's interpretation thereof, is arbitrary and suspect.

Retained Counsel does not represent either Petitioner or Mr. al-Nashiri,[26] Appointed Military Counsel's superior officer actually encouraged and directly participated in that violation. In so doing, Colonel David, as the head of the CDC, assumed the role of denying detainees of their right to choice of counsel by further isolating them from independent counsel they retained. This questionable policy has led to great difficulty at Guantánamo Bay and is clearly illegal. *See Gonzalez-Lopez, supra,* footnotes 19, 20 and 26, *supra.* Under these circumstances, the declarations submitted by Appointed Military Counsel and Colonel David must be viewed as suspect.

Appointed Military Counsel's conflicted representation also taints his declaration. His failure to address Retained Counsel's conflict-of-interest concerns had deepened the already existing rift in their relationship and calls into question whether his actions herein are made in good faith. Here, the potential for a conflict of interest between Petitioner and Mr. Mohammed is unmistakably clear. The government's allegations against Petitioner and Mr. Mohammed, if correct, suggest that Petitioner may have worked directly for, or under the indirect supervision of, Mr. Mohammed in the furtherance of not only the September 11th attacks, but a number of other terrorist attacks as well. *See* Fenstermaker Declaration, ¶¶ 17, 18, 19, and 20. There can be no doubt that the potential for conflict here is significant and had to be addressed early and adequately before significant damage could be inflicted upon Petitioner's defense. *See United States v. Gantt,* 140 F.3d 249, 254 (D.C. Cir.), *cert. den.,* 525 U.S. 941 (1998), *quoting United*

---

[26] Colonel David can cite to no authority for his claim that he is authorized to decide who represents which detainee. Colonel David's sole authority is to determine whether a civilian attorney may be a member of the Pool. *See* Regulation for Trial by Military Commission, Chapter 9-1(a)(11). The detainee is the person who decides to retain civilian counsel, not Colonel David. *See United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006) (holding that a trial court's erroneous deprivation of a criminal defendant's choice of counsel entitles the defendant to a reversal of his conviction, irrespective of prejudice or lack thereof).

*States v. Bruce*, 89 F.3d 886, 898 (D.C. Cir. 1996) (conflict where attorney must choose between advancing one client's interest over that of the other). As the Supreme Court recognized, "a defendant's *Sixth Amendment* right to effective assistance of counsel may be violated when an actual conflict of interest adversely affects the adequacy of the defendant's representation." *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998) *citing Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980); *see also United States v. Brown*, 2007 U.S. Dist. LEXIS 41090 (Dist. Colonel 2007). Appointed Military Counsel's assurances, based solely on a reliance upon Petitioner's determination of no conflict, was insufficient to satisfy the matter legally. *Campbell v. United States*, 352 F.2d 359, 360 (D.C. Cir. 1965), *citing Wynn v. United States*, 275 F.2d 648, 649 (D.C. Cir. 1960) ("[D]efendants are unlikely to be sufficiently aware of their rights to object to a possible conflict of interest."). Appointed Military Counsel's unwillingness to appropriately address the conflict-of-interest issue and the tension stemming therefrom casts doubt on the credibility of his declaration.

In short, support for Subordinate Civilian Counsel's claim that Petitioner has terminated Retained Counsel is based on tainted proof from sources of suspect credibility. Unlike the typical criminal defendant, Petitioner, as a detainee confined at a facility in Guantánamo Bay under heavy restriction in his communication with the outside world, is confronted with many hurdles in securing independent counsel.[27] The Court should give full effect to Petitioner's October 20, 2007 decision to proceed with independent counsel and avoid dismantling the existing relationship on flimsy and unsubstantiated evidence. Under the

---

[27] Respondent's recent refusal to permit Petitioner to receive privileged mail from Retained Counsel only serves to highlight Petitioner's isolation. Indeed, Respondent's policy of returning privileged mail or distributing only non-privileged mail would preclude Petitioner from accessing independent counsel through letter-writing, the only means by which he would have to secure counsel independent of military involvement.

29

circumstances presented here, investigation into Petitioner's true intent is necessary in order to avoid further violation of Petitioner's Fifth and Sixth Amendment rights.

REQUEST FOR EVIDENTIARY HEARING AND OTHER RELIEF

Petitioner has raised sufficient facts to show that Petitioner's Fifth and Sixth Amendment rights to counsel of his choice and to due process of law are at stake. Petitioner, who is one of the few Guantánamo Bay detainees who successfully retained independent counsel unaffiliated with the military, is now confronted with the possibility of losing his counsel of choice because of military officers' control over access to and communication with the detainee by their intentional interference with his relationship with chosen counsel. Here, the ordering of an evidentiary hearing is entirely appropriate. Unlike Appointed Military Counsel's situation, Retained Counsel's current means of communicating with Petitioner is wholly ineffective, particularly in matters that demand immediate attention and responses and the transmission of privileged materials. The instant matter is just such an example. First, timely response to motions, such as this one, demands immediate and effective access to Petitioner. To await a written reply from Petitioner to address issues raised by motions, such as this one, is likely to require a span of many months before an attorney's inquiries for his motion response is complete. Second, the government has blocked all privileged means of communicating with Petitioner. As described earlier, the government has determined to block Retained Counsel's privileged letters, sent through the non-legal mail system, from reaching the detainees, including Petitioner, on the grounds that they have been marked privileged. The government's refusal to deliver the mail to the detainees, despite Retained Counsel's July 1, 2008 e-mail to Mr. Warden, is a deliberate attempt to cut off all communication between Retained Counsel and the detainees. To be sure, any claims by the government that it is seeking to preserve the privilege by returning

30

the correspondence to Retained Counsel is suspect. It is well-known that similar legal mail sent through the legal mail system by a recognized attorney representing a detainee is also subject to screening and review by the government for communication outside the scope of the protective order. *See Bismullah, supra.* After screening, priviliged mail is then forwarded to the detainee, with redactions, if necessary. Here, the government's refusal to treat legal mail sent by Retained Counsel in a similar fashion lends credence to Retained Counsel's claim that the rejection of Retained Counsel's mail is simply a ploy to thwart all communication by Retained Counsel to Petitioner regarding Petitioner's legal rights.

More importantly, it is a ploy that precludes the Court from discovering Petitioner's true intent in its fact-finding role. At bottom, this act is simply another instance of government interference with Petitioner's attorney-client relationship with Retained Counsel. After all, where supposedly only Petitioner's *written* communications are cleared for dissemination while his oral communications are all deemed "top-secret," Petitioner's letters are the only means available to this Court of discerning Petitioner's true intent in his own words.[28] This lack of privileged and confidential communications further impedes Petitioner's right to counsel and due process of law.

Only with Petitioner's direct participation in these proceedings can the Court be assured of his intent with respect to his choice of attorney. Petitioner therefore requests an evidentiary hearing before this Court, in Washington, D.C., where Petitioner can personally disclose his intentions and clarify any ambiguity raised by Subordinate Civilian Counsel's July 25th application. Furthermore, Appointed Military Counsel and Colonel David must be

---

[28] *See* footnote 25, *supra.* Indeed, based upon Appointed Military Counsel's interpretation of the rules regarding Petitioner's oral communications, Petitioner would be precluded from testifying orally because his oral testimony would be "top-secret."

examined under oath at this very same proceeding, at which Appointed Military Counsel's qualification to serve in a conflict-free capacity may be reviewed, along with the role that he and Colonel David may have played in Petitioner's alleged termination of Retained Counsel.

Similarly, this Court should issue an order directing that Retained Counsel be permitted to utilize the legal mail channels established between detainees and their counsel. This Court should also issue an order permitting Retained Counsel to travel to Guantánamo Bay for the purpose of meeting with Petitioner for a reasonable period of time, or otherwise require Respondent to report to the Court the status of Retained Counsel's security clearance application. In order to effectuate this ruling, Respondent should also be directed to deliver the 16 wrongfully-rejected envelopes containing privileged correspondence to Petitioner and Mr. al-Nashiri within 48 hours of the signing of this order.

Finally, this Court should issue a writ of prohibition prohibiting Respondent or his subordinates from referring Petitioner's matter to a military commission until Subordinate Civilian Counsel's July 25, 2008 application and Petitioner's request for affirmative relief are decided. *See* 28 U.S.C. §1361. For the military commission to proceed without appropriate counsel present would cause irreparable harm to Petitioner's defense.

## CONCLUSION

Petitioner requests that this Court deny Subordinate Civilian Counsel's July 25, 2008 application and grant the aforementioned affirmative relief.

Dated: New York, New York
       August 4, 2008

                    Respectfully submitted,

                    **The Law Offices of Scott L. Fenstermaker, P.C.**

By:     _Scott L. Fenstermaker_
                    Scott L. Fenstermaker, Esq.

                    300 Park Avenue, 17th Floor
                    New York, New York 10017
                    212-302-0201

To:    Judry L. Subar, Esq.           David H. Remes, Esq.
       US Department of Justice     Covington & Burling, LLP
       20 Massachusetts Ave., N.W.  1201 Pennsylvania Avenue, N.W.
       Washington, DC 20530       Washington, DC 20004