**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-----------------------------------------------------------

AHMED KHALFAN GHAILANI,

                                  Petitioner,                               08 cv 1190 (RJL)

          v.                                                   Declaration Pursuant to
                                                         28 U.S.C. §1746

ROBERT M. GATES,

                                  Respondent.

-----------------------------------------------------------

**DECLARATION OF MATERIAL FACTS**

      SCOTT L. FENSTERMAKER, ESQ., an attorney at law practicing before this Court pursuant to Local Civil Rule 83.2(g), being duly sworn, declares and says, pursuant to 28 U.S.C. §1746:

      1.  I am retained counsel for Petitioner Ahmed Khalfan Ghailani, a detainee currently being held by Respondent at Guantánamo Bay, Cuba.

      2.  I file this declaration, pursuant to 28 U.S.C. §1746, in support of Petitioner's response to the July 25, 2008 filing of David H. Remes, Esq., purportedly on Petitioner's behalf, styled "Motion to (1) Strike Scott L. Fenstermaker's Unauthorized Notice of Appearance as Petitioner's Counsel in This Matter, (2) Name David H. Remes as Petitioner's Counsel in This Matter, and (3) Bar Mr. Fenstermaker from Making Any Further Filings Holding Himself Out as Petitioner's Counsel in This Matter."

      3.  I also submit this declaration in support of Petitioner's request for affirmative relief, for (a) an evidentiary hearing, to be held by this Court in Washington, DC, at which the Court and I can question Petitioner regarding his choice of counsel and the voluntariness of that

decision, and permitting me to examine Colonel Steven H. David and Lt. Col. Michael Acuff under oath, or in the alternative; (b) for a hearing to be held at the United States Naval Station at Guantánamo Bay, Cuba at which this Court, or a referee designated by this Court, and I can question Petitioner regarding his choice of counsel and the voluntariness of that decision, and permitting me to examine Colonel Steven H. David and Lt. Col. Michael Acuff under oath; or (c) as an alternative to (a) and (b) above, permitting me to take the sworn testimony of Petitioner at the United States Naval Station at Guantánamo Bay, Cuba regarding his choice of counsel and the voluntariness of that decision, and to take the sworn testimony of Colonel Steven H. David and Lt. Col. Michael Acuff in Washington, D.C. Petitioner further requests that this Court issue (d) an Order of this Court directing Respondent to permit me to travel to Guantánamo Bay, Cuba to meet privately with Petitioner for a reasonable period of time; (e) a protective order permitting me, among other things, to correspond with Petitioner through the legal mail system currently in place to facilitate communications between counsel and detainees at Guantánamo Bay, Cuba; (f) an order of this Court directing that Respondent or his subordinates deliver 16 envelopes containing legal mail returned to Scott L. Fenstermaker, Esq., on July 31, 2008 to Petitioner and Rahim al-Nashiri within 48 hours of the signing of this order; and (g) a writ of prohibition, pursuant to 28 U.S.C. §1361, prohibiting Respondent and any of his subordinates, including Susan J. Crawford, the convening authority for the military commissions, from referring war crimes charges against Petitioner until this Court renders a determination of Mr. Remes' application and Petitioner's request for affirmative relief. Petitioner also applies for an order permitting Petitioner to file correspondence from Petitioner to me and various communications between counsel purporting to act on Petitioner's behalf under seal and *ex parte* for the Court's *in camera* review.

4.  My attorney-client relationship with Petitioner was established through a series of five letters I received from Petitioner. Those letters, which are dated October 20, 2007, April 10, 2008, April 16, 2008, May 12, 2008 and May 26, 2008, are attached as Exhibit A.[1]  I have provided a copy of Petitioner's October 20, 2008 letter to me to Colonel Steven H. David, the Chief Defense Counsel for the Office of Military Commissions and to Mr. Remes. I have reason to believe that Lt. Col. Michael Acuff, as a member of the Office of the Chief Defense Counsel, also has a copy of this letter. I provided a copy of Petitioner's April 10, 2008 letter to me to Lt. Col. Acuff, Messrs. Remes and Randall T. Coyne, another civilian attorney selected by Lt. Col. Acuff to assist Lt. Col. Acuff. I provided a copy of Petitioner's April 16, 2008 letter to Mr. Coyne. I did not provide a copy of this letter to Mr. Remes because on June 19, 2008 Mr. Remes instructed me to cease communicating with him via email.[2]  I have not provided copies of Petitioner's May 12, 2008 and May 26, 2008 letters to any other party.[3]  Other than these five letters, I have received no communication from Petitioner of any nature, other than Colonel David's and Lt. Col. Acuff's interpretations of Petitioner's alleged statements.

5.  I was first approved as a member of the Pool of Qualified Civilian Defense Counsel (the "First Pool") in the spring of 2005 by Colonel Will A. Gunn, who was then the Chief Defense Counsel for the Office of Military Commissions. A civilian attorney must be a member of the Pool in order to represent detainees held at Guantánamo Bay before a military commission. After the Supreme Court's decision in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), and the enactment of the Military Commissions Act of 2006, the First Pool was disbanded and

---

[1] I received Petitioner's April 10, 2008, April 16, 2008, May 12, 2008, and May 26, 2008 letters on May 23, 2008, June 16, 2008, July 21, 2008 and July 21, 2008 respectively.

[2] Mr. Remes made this request in response to my having raised Lt. Col. Acuff's apparent conflict of interest with Mr. Remes during an exchange of e-mails.

[3] Copies of these letters were filed, under seal, with the United States Court of Appeals for the District of Columbia Circuit in response to a parallel application made by Mr. Remes in that court. *See Ghailani v. Gates*, 08 CV 1209.

3

members of the First Pool were required to reapply. By letter dated August 10, 2007, I was readmitted to the new Pool of Qualified Civilian Defense Counsel (the "Second Pool") by Colonel Dwight H. Sullivan, who was then the Chief Defense Counsel for the Office of Military Commissions.

6. In the late summer or early fall of 2007, I began receiving correspondence, through the non-legal mail channels, from detainees at Guantánamo Bay who the government refers to as "High Value Detainees" (hereinafter "Former CIA Prisoner(s)"). The Former CIA Prisoners from whom I have received correspondence include Petitioner, Rahim al-Nashiri, Ammar al-Baluchi (aka, Ali Abdul Aziz Ali), Mohd Narir bin Lep, Abu al-Farraj al-Lybea (aka Abu Faraj al-Libi), Abu Zubaydah, Mohd Farik bin Amin, and Mustafa bin-Ahmed Hawsawi. Petitioner and Mr. al-Nashiri clearly asked me to represent their legal interests. As a result of a translation of Mr. Hawsawi's letter from Arabic to English, I believed that he asked that I represent his legal interests. The Office of the Chief Defense Counsel disagreed with that interpretation, although all agreed that Mr. Hawsawi asked to meet with me.

7. During this period of time, I also wrote back to a number of the Former CIA Prisoners. I have established a dialogue of sorts with Petitioner, Messrs. al-Nashiri, al-Baluchi and al-Libi.[4]

8. By letter dated December 14, 2007, I notified various officials in the United States government that I represented Petitioner "in all matters relating to his detention in your custody."[5] The officials I notified included Colonel David, Brigadier General Thomas W. Hartmann, the legal advisor to the Office of Military Commissions, and Ms. Crawford. By letter

---

[4] As described in greater detail below, my dialogue with these detainees may have ended as a result of Respondent's announcement that he and his subordinates will no longer deliver my attorney-client communications to Guantánamo Bay detainees.

[5] I have reason to believe that Petitioner did not receive a copy of my December 14, 2007 notification letter until April of 2008. *See* Exhibit A. It is my experience that delays of this extent are the norm for mail sent through non-legal mail channels.

dated March 31, 2008, I again notified Ms. Crawford, General Hartmann and Colonel David of my attorney-client relationship with Petitioner. A copy of my December 14, 2007 and March 31, 2008 letters are attached hereto as Exhibit B.

9. During the late fall or early winter of 2007-2008, I contacted military personnel at Southcom, the Department of Defense's unified command with responsibility over Guantánamo Bay.[6] Shortly after contacting Southcom, I received a telephone call from Robert M. Loeb, an attorney at the Department of Justice who apparently is involved in representing Respondent in some of the Guantánamo Bay-related litigation. In a telephone conversation occurring on January 11, 2008, Mr. Loeb informed me that I would not be permitted to travel to Guantánamo Bay to meet with my clients and the other detainees unless I filed a DTA petition and had obtained the appropriate security clearance. Mr. Loeb also informed me that I would have to present sufficient indicia of my authority to represent the detainees. I asked Mr. Loeb what indicia would be sufficient and he declined to elaborate.

10. During the same period of time that I was contacting Southcom, I also contacted the Office of the Chief Defense Counsel for the Office of Military Commissions to determine if that office might be able to assist in my visiting the detainees who had contacted me, each of whom the government had announced its intention to charge with war crimes before the military commissions. Upon contacting the Office of the Chief Defense Counsel, I spoke with Michael Berrigan, who is the Deputy Chief Defense Counsel and, as such, is Colonel David's immediate subordinate.

11. Mr. Berrigan informed me that his office could not assist me in obtaining permission to travel to Guantánamo Bay to speak to the detainees. During this conversation, I

---

[6] My call to Southcom was precipitated by an intermediary who contacted a faculty member at the United States Military Academy at West Point. The West Point faculty member suggested to the intermediary that I contact the Judge Advocate General's office at Southcom. I am unaware of the identity of the West Point faculty member who provided this information.

asked Mr. Berrigan for a list of all of the civilian counsel who were members of the Second Pool. Mr. Berrigan informed me that he could not provide me this information because of "Privacy Act considerations." I then asked Mr. Berrigan if he could tell me how many attorneys were members of the Second Pool. Mr. Berrigan informed me that he could not. When I asked Mr. Berrigan why he could not disclose the number of attorneys in the Second Pool, he informed me that such information "would give [me] an unfair advantage in representing the detainees." I asked Mr. Berrigan how knowing the number of attorneys in the Second Pool would give me an unfair advantage in representing the detainees. In response, Mr. Berrigan hung up the phone. I immediately called Mr. Berrigan back but he did not answer. I left a message on his voicemail. Mr. Berrigan has never returned my telephone call.

12. In early April of 2008, Colonel David asked that I provide him, in his capacity as Chief Defense Counsel for the Office of Military Commissions, some substantiation of my claims that I represent Petitioner and Messrs. al-Nashiri and Hawsawi. By letter dated April 5, 2008, I provided Colonel David with that information.

13. I subsequently received a call from Major Jon Jackson, who apparently serves as Mr. Hawsawi's Appointed Military Counsel. Major Jackson claimed that it was his position that the substantiation that I had regarding my relationship with Mr. Hawsawi was insufficient and that, based upon classified information which he had reviewed, but which he could not share with me, Messrs. al-Nashiri and Hawsawi had a conflict of interest. Major Jackson acknowledged that Mr. Hawsawi clearly stated a desire to meet with me. Major Jackson informed me that he would determine whether to share my interest in representing Mr. Hawsawi with Mr. Hawsawi. I have never heard from Major Jackson again.

14. At about the same time that I heard from Major Jackson, I received communication from Lt. Col. Acuff, who Colonel David apparently assigned to serve as

6

Petitioner's Appointed Military Counsel on April 24, 2008. Lt. Col. Acuff informed me that he was Petitioner's assigned counsel and he wanted to know what I might be able to bring "to his (Lt. Col Acuff's) team." I informed Lt. Col. Acuff that I was Petitioner's attorney, but that I would gladly work with him in his capacity as Appointed Military Counsel. Neither Colonel David nor Lt. Col. Acuff ever expressed disagreement with my position that Petitioner's October 20, 2007 letter established an attorney-client relationship between Petitioner and me. Lt. Col. Acuff never asked for, or received, my permission to speak to Petitioner.

15. On Monday, May 12, 2008, I received a telephone message from Lt. Col. Acuff, who had apparently just returned from Guantánamo Bay after having spoken with Petitioner.[7] Upon receiving Lt. Col. Acuff's message, I immediately returned his call at approximately 10:00 a.m. During this call, which lasted 52 minutes, Lt. Col. Acuff proceeded to inform me that he was not comfortable having me on "his team." When I asked Lt. Col. Acuff the reason for his discomfort, he told me that he and some of his colleagues in the Office of the Chief Defense Counsel of the Office of Military Commissions felt that I was ineffective in my prior efforts to help the detainees,[8] that I was unqualified, and that I lacked diligence and dedication to the detainees' cause. Lt. Col. Acuff also informed me that he was aware that I am a graduate of Harvard Law School and the United States Air Force Academy. He then stated, "Frankly Scott, I know you are smarter than me." I assured Lt. Col. Acuff that my educational background was irrelevant to Petitioner's defense and that such thoughts never occurred to me. Lt. Col. Acuff further informed me that the trial of Petitioner's military commissions' matter would likely last six months and that I almost certainly would not have time to assist him. I assured Lt. Col. Acuff that this would not be a problem. I asked Lt. Col. Acuff to identify the colleagues who expressed

---

[7] Apparently, Lt. Col. Acuff met with Petitioner, without my permission, on May 7, 2008 and May 8, 2008. *See* Exhibit A.
[8] *See Fenstermaker, et. al. v. Bush, et. al.*, 05 CV 7468 (RMB) (SDNY) and 07-cv-2980 (2d Cir.).

concerns about me to him. He refused. I also asked Lt. Col. Acuff how my efforts on behalf of the detainees had fallen short and in which actions I had demonstrated my shortcomings. Lt. Col. Acuff forthrightly admitted that he had no knowledge or information regarding any of my failings or shortcomings. During this telephone conversation, Lt. Col. Acuff informed me that anything that was discussed between he and Petitioner was "top secret" and that, as a result of my lack of top secret clearance, he could not disclose the substance of his conversation with Petitioner to me. Lt. Col. Acuff also informed me in substance that "if [Lt. Col. Acuff] had wanted to have ended [my] involvement in [Petitioner's] matter, [he] could have done so."[9] Lt. Col. Acuff did not explain what he meant by this apparent threat. Lt. Col. Acuff suggested that our differences could be discussed if only I were available to travel to Washington, DC to meet with him. I immediately accepted and made arrangements to travel to Washington the next day, May 13th.

16. I met with Lt. Col. Acuff and with Colonel David for several hours on May 13th at their offices in Washington, DC and during a lunch meeting with Lt. Col. Acuff. During my meetings with Colonel David and Lt. Col. Acuff on May 13th, I learned that Lt. Col. Acuff had also been assigned to serve as Associate Detailed Military Defense Counsel for Khalid Sheikh Mohammed, another detainee facing military commissions' charges as a result of his alleged role as the "mastermind" of the September 11th attacks. The United States government claims that Mr. Mohammed was the "Chief of External Operations" for al-Qaeda subsequent to September 11, 2001. This information alerted me to Lt. Col. Acuff's potential conflict of interest and accordingly, I began investigating the relationship of Petitioner and Mr. Mohammed for that purpose.

---

[9] This statement is paraphrased, as I was not taking notes and was stunned by this apparent threat.

17.   According to government allegations, disclosed in publicly released "biographies," in addition to involvement in the bombing of the United States embassy in Dar es Salaam, Tanzania in 1998, Petitioner allegedly served as a "document forger and travel facilitor" for al Qaeda.  *See http://www.defenselink.mil/pdf/detaineebiographies1.pdf*, page 2.  Petitioner's government-provided biography also alleged that he "rose in stature after 11 September 2001 to become one of al-Qa'ida's top forgers."  *See id.*  Furthermore, "[m]ost of [Petitioner's] work involved substituting photos in passports and modifying visa stamps."  *Id.*   In addition, "[Petitioner] and several other operatives moved to Afghanistan – which [Petitioner] had wanted to do for several years – the day before the Embassy bombings.  After arriving in Afghanistan [Petitioner] attended regular training at one of al-Qa'ida's camps and served as a rank-and-file soldier.  [Petitioner] eventually became a cook for Usama bin Laden before joining a group of fellow Africans in 2001 who ran al-Qa'ida's document forgery office in Kandahar, Afghanistan."  *See id.*  The government further claims that "[Petitioner] fled to Karachi, Pakistan, after the fall of the Taliban, but [that] high-profile arrests in Karachi in April 2003 convinced him to move to South Waziristan."[10]  *See id.*

18.   During his Combatant Status Review Tribunal ("CSRT") testimony, Petitioner acknowledged training in the Al Farouq al Qaeda training camp in Afghanistan after leaving Tanzania in 1998.  *See http://www.defenselink.mil/news/transcript_ISN10012.pdf*, page 11 of 19. During this same proceeding, Petitioner also acknowledged preparing documents/passports for al Qaeda in Pakistan in 2004.  *See id.*, page 12 of 19.   Petitioner also acknowledged being in Afghanistan from 1998 through the United States invasion of Afghanistan in the fall of 2001. *See id.*, pages 13, 15 and 16 of 19.  After leaving Afghanistan, Petitioner acknowledged traveling to Pakistan.  *See id.*  Petitioner also admitted to living with one of Mr. Mohammed's relatives

---

[10] One of the "high profile" arrests to which this biography refers was almost certainly Mr. Mohammed's.

9

while in Pakistan and testified to having met Osama bin Laden and Mr. Mohammed during his stay in Afghanistan. *See id.*, page 16 of 19.

19.   According to the United States government's biography of Mr. Mohammed, Lt. Col. Acuff's other client, Mr. Mohammed "was the driving force behind the attacks on 11 September 2001 as well as several subsequent plots against U.S. and Western targets worldwide." *See http://www.defenselink.mil/pdf/detaineebiographies1.pdf*, page 13.   Similarly, the United States government claims that "[b]y late 2001, with the collapse of the Taliban regime and the dispersal of al-Qa'ida's leadership, the prestige associated with engineering the attacks on 11 September propelled [Mr. Mohammed] into the role of *external operations chief* for al-Qa'ida." *See id.* (emphasis added).   The government also claims that Mr. Mohammed was involved in "a plan in early 2002 to send al-Qa'ida operatives to conduct attacks in the U.S. and a plot in early 2003 to employ a network of Pakistanis – including [another Former CIA Prisoner] – to smuggle explosives into New York and to target gas stations, railroad tracks, and a bridge in New York." *Id.*

20.   According to the transcript of Mr. Mohammed's CSRT hearing, Mr. Mohammed claimed responsibility for, among other things, the beheading of Daniel Pearl, the so-called "Shoe Bombing Operation" perpetrated by Richard Reid, "the Filka Island Operation," a nightclub bombing in Bali, Indonesia, the plans to attack the "Library Tower," Sears Tower, Plaza Bank and the Empire State Building, the destruction of an Israeli El-Al flight in Thailand, a hotel bombing in Mombasa, and the "launching [of] a Russian-made SA-7 surface-to-air missile on El-Al" airplanes in Mombasa. *See http://www.defenselink.mil/news/transcript_ISN10024.pdf*, pages 18 and 19 of 26.   Mr. Pearl was killed in late January or early February of 2002; the "Shoe Bombing Operation" occurred on or about December 22, 2001; the Filka Island operation occurred on or about October 8, 2002; the Bali bombings occurred on October 12, 2002; the

10

plans to bomb the Library Tower, Sears Tower, Plaza Bank, and Empire State Building which apparently occurred in late 2001 through early 2002; the Mombasa El-Al operation occurred on or about September 24, 2003; the Mombasa bombing occurred on November 28, 2002; and the SA-7 attack on El-Al airliners occurred in November of 2002.

21.   During a telephone conversation that I had with Lt. Col. Acuff on May 19, 2008 at approximately 5:00 p.m., I suggested to him that he consider whether he had a conflict of interest in his simultaneous representation of both Petitioner and Mr. Mohammed.  During this same conversation, I informed Lt. Col. Acuff that his involvement in Petitioner's military commissions' matter might raise concerns regarding Petitioner's Sixth Amendment right to counsel.  Lt. Col. Acuff informed me that he was not concerned because, while his conduct as Petitioner and Mr. Mohammad's representative may raise an issue at an appellate level, the military judges would not consider this issue seriously.  I sought confirmation of Lt. Col. Acuff's statement by sending him a letter, dated May 19, 2008.  A copy of that letter is attached hereto as Exhibit C.

22.   Also on May 19, 2008, I brought my Sixth Amendment concerns to the attention of General Hartmann and Ms. Crawford by letter.  A copy of my May 19th letter is attached as Exhibit D.  This letter, among other things, objected to Lt. Col. Acuff's meeting with Petitioner without my consent.  This letter was copied to Colonel David and Lt. Col. Acuff, among others.

23.   On or about May 21, 2008, Lt. Col. Acuff wrote me a letter, which he apparently copied to Petitioner, in which he claimed that I was not Petitioner's lead counsel and that he assumed that he "would be leading the team and that [I] was willing to be part of a team effort." A copy of Lt. Col. Acuff's May 21st letter is attached as Exhibit E.  Lt. Col. Acuff's May 21st letter did not address the Military Commissions Act of 2006, the Rules of the Military Commissions or the Regulations for Trial by Military Commission, all of which make clear that

retained civilian counsel is lead counsel and that Appointed Military Counsel is to act under the supervision of retained civilian counsel.

24. On May 27, 2008, I sent an e-mail to Lt. Col. Acuff in which I stated as follows, "Please be advised that I maintain that I have not given you permission to meet with or otherwise communicate with [Petitioner]. Should you meet with, or otherwise communicate with [Petitioner] absent my written permission, I will raise my Sixth Amendment and Rules of Professional Conduct concerns again." A copy of my May 27, 2008 e-mail is attached as Exhibit F. The e-mail described my concerns regarding the Department of Defense's apparent attempt to interfere, on a systematic basis, with the detainees' counsel of choice as a matter of institutional policy.

25. On June 1, 2008, I sent an e-mail to Lt. Col. Acuff, in which I reminded him that "I have asked you on several occasions not to speak with [Petitioner]. It is clear that you are operating under a conflict of interest." A copy of this e-mail is attached as Exhibit G. I also informed him that "[s]hould you meet with [Petitioner] notwithstanding my repeated requests that you not do so and the apparent conflict of interest posed by your dual representation, I ask that you review, prior to your meeting, the biographies and various allegations, both charged and uncharged, made by the government about Messrs. Mohammed and [Petitioner]." In this e-mail, as a result of Lt. Col. Acuff's assertion that Petitioner asked to speak to him, I stated that "the propriety of your first meeting with [Petitioner] is still the subject of discussion, . . . ." I also pointed out that "I have yet to see anything in writing indicating [Petitioner's] desire to meet with detailed [military] defense counsel."

26. On June 5, 2008, the five defendants facing military commissions' charges as a result of their alleged involvement in the September 11th terrorist attacks were arraigned at Guantánamo Bay before a military commission judge. One of these five defendants, Ammar al-

Baluchi (aka, Ali Abdul Aziz Ali), complained to the military commissions' judge that he had

been trying to communicate with me, apparently for the purpose of securing my services as his

attorney.                                                                                          *See*

*http://us.ft.com/ftgateway/superpage.ft?news_id=fto060920081244373936&page=2.*    Mr.  al-

Baluchi also accused the government of obstructing his communications with me.   I have

received three letters from Mr. al-Baluchi.   Based on the letters I received from Mr. al-Baluchi, I

have reason to believe that Mr. al-Baluchi has written me at least five, and perhaps more, letters.

I requested a copy of the transcript of the June 5, 2008 arraignment proceedings and was denied

a copy by the Deputy Clerk of Court for the Office of Military Commissions.

27.   On June 9, 2008, I sent an e-mail to Lt. Col. Acuff, which was copied to Colonel

David.   A copy of this e-mail is attached as Exhibit H.   In this e-mail, I explained Lt. Col.

Acuff's apparent conflict of interest as a result of his simultaneous representation of Petitioner

and Mr. Mohammed.   I also asked Lt. Col. Acuff to cease sending written correspondence as

Petitioner's counsel.

28.   On June 18, 2008 at 1:32 pm, Lt. Col. Acuff sent me an e-mail, which is

attached as Exhibit I, in which he stated, "I have discussed any potential conflict with

[Petitioner] and he has confirmed to me that there is in fact no actual conflict.   Of course, when

co-counsel are qualified to talk to [Petitioner], they are welcome to explore that issue."   Lt. Col.

Acuff never explained Petitioner's analysis of the fact that no actual conflict existed.   In Lt. Col.

Acuff's June 18th e-mail, he also stated that "it is clear that [Petitioner's] decision is a reflection

of the decision of [Ammar al-Baluchi], with who (sic) he has virtually daily opportunity to

communicate.   I think that you can expect that, in the end, his decision will mirror that of Mr.

[al-Baluchi], whose decision similarly at this point reflects that of [Mr. al-Baluchi's] uncle, [Mr.

13

Mohammed]."[11]  It is unclear what, if any, effort Lt. Col. Acuff undertook to determine if Mr. al-Baluchi was intimidating or otherwise coercing Petitioner to proceed on a *pro se* basis and consider whether a separation order would preclude such coercion.

29.  On June 18, 2008 at 5:28 pm, I sent an e-mail to Lt. Col. Acuff in which I asked him, "Has [Petitioner] asked to speak to me, at any time, during any of your meetings with him?" A copy of my June 18, 2008 e-mail is attached as Exhibit J.  Lt. Col. Acuff never answered my question regarding Petitioner's desire to speak with me.

30.  On June 20, 2008, I sent an e-mail to Lt. Col. Acuff.  A copy of this e-mail is attached as Exhibit K.   In this e-mail, I asked Lt. Col. Acuff whether "[d]uring your conversations with [Petitioner], did he ever request to speak with me?"  I also instructed Lt. Col. Acuff to "not meet with him again."  Lt. Col. Acuff again refused to respond to my inquiry regarding Petitioner's requests to speak to me.

31.  On June 23, 2008, I brought my concerns regarding Lt. Col. Acuff and his apparent conflict of interest to the attention of Ms. Crawford and General Hartmann.  My June 23, 2008 letter is attached as Exhibit L to this Declaration.  My June 23, 2008 letter discussed my concerns about Lt. Col. Acuff's role as "Associate Defense Counsel" and the apparent conflict of interest arising from his simultaneous representation of Petitioner and Mr. Mohammed.  By letter dated June 25, 2008, General Hartmann informed me that as a result of his conversations with Colonel David, he would no longer recognize me as Petitioner's counsel.[12]  A copy of General

---

[11] I have reason to believe that the decision of Mr. al-Baluchi and at least some of the other September 11th codefendants to proceed on a *pro se* basis was not made in a voluntary fashion. I can support this assertion in an *ex parte* and sealed submission to the Court. I have not raised this issue with the judge presiding over the September 11th military commission because I am not, at this time, counsel to any defendant in that matter. I have reason to believe that Mr. al-Baluchi will raise this issue with the judge at the appropriate time.

[12] On July 28, 2008, I received a letter, dated July 21, 2008, from Michael C. Chapman, the Deputy Legal Advisor to the Convening Authority for the Military Commissions. Mr. Chapman's July 21st letter, which mirrors Gen. Hartmann's June 25, 2008 letter regarding my

Hartmann's June 25, 2008 letter is attached hereto as Exhibit M.   General Hartmann never addressed my concerns regarding Lt. Col. Acuff's apparent conflict of interest or the propriety of Lt. Col. Acuff's repeated meetings with Petitioner against my explicit directions that he not do so.

32.   On July 1, 2008, I received an e-mail from Andrew I. Warden, an attorney with the Department of Justice.   Mr. Warden's July 1st e-mail is attached as Exhibit N.   In Mr. Warden's e-mail, he explains that "[b]ecause you are not authorized to send or receive mail pursuant to any appropriately entered protective orders, the mail you recently sent to [Mr. al-Nashiri and Petitioner] would ordinarily be processed in accordance with the procedures established for non-privileged mail unless you request that the mail be returned to you.   Because that mail is marked privileged, it has not been reviewed or otherwise processed at this point."

33.   The mail to which Mr. Warden refers was sent to an address provided to me by an Assistant United States Attorney with the Office of the United States Attorney for the Southern District of New York pursuant to litigation I filed on behalf of Petitioner and some of the other detainees at Guantánamo Bay in New York several years ago.   This address was provided to me pursuant to the government's effort to assure the Court that I had the ability to write detainees at Guantánamo Bay and provide legal information and advice to them.

34. After receiving the July 1, 2008 e-mail of Andrew I. Warden, I responded by sending the e-mail attached hereto as Exhibit O.   In that e-mail, I stated, among other things, "[y]ou are free to process my mail to my clients in whatever fashion you like, so long as they get

---

status as Petitioner's counsel, informs me that it is Colonel David's position that I do not represent Rahim al-Nashiri, a detainee facing trial by military commission as a result of his alleged role in the bombing of the USS Cole in August of 2000.  I have received two letters from Mr. al-Nashiri which clearly ask that I serve as his attorney and as his "next friend."  Mr. al-Nashiri's first letter to me, dated August 22, 2007, arrived in my office via first class mail on January 30, 2008 and was postmarked January 28, 2008.

it. I will reserve my arguments regarding the privileged nature of the correspondence for the appropriate forum."

35. On July 31, 2008, I received a package from the Office of the Staff Judge Advocate at Guantánamo Bay. That package included 16 envelopes containing correspondence addressed to my two clients who are being held at Guantánamo Bay, Rahim al-Nashiri and Petitioner. Along with the 16 envelopes was a memorandum from Major Greg Musselman, JAGC, USA. A copy of Major Musselman's memorandum is attached as Exhibit P. In his memorandum, Major Musselman explained that the Office of the General Counsel of the Department of Defense advised the Office of the Staff Judge Advocate at Guantánamo Bay to return the 16 envelopes to me.

36. The envelopes in question constitute essential attorney-client correspondence to Petitioner and Rahim al-Nashiri, my two clients detained at Guantánamo Bay. This correspondence was addressed and postmarked as follows:

     a. Petitioner, June 24, 2008

     b. Petitioner, June 24, 2008

     c. Petitioner, June 28, 2008

     d. Petitioner, June 28, 2008

     e. Petitioner, June 30, 2008

     f. Petitioner, June 30, 2008

     g. Petitioner, July 7, 2008

     h. Petitioner, June 28, 2008

     i. Petitioner, June 24, 2008

     j. Mr. al-Nashiri, June 17, 2008

     k. Petitioner, June 21, 2008

l.   Petitioner, June 21, 2008

m.   Petitioner, May 28, 2008

n.   Mr. al-Nashiri, June 17, 2008[13]

37. Prior to appointment of Appointed Military Counsel, I had been sending mail to detainees at Guantánamo Bay, without incident, for 10 months.

38.   I have been using the address to which the above mail was sent for the past 13 months in communicating with Guantánamo Bay detainees.  During this 13-month period, I have written numerous letters addressed to many detainees using this address.  Each of these letters was marked privileged.  I have received numerous letters and postcards from many detainees in response to these letters.  Mr. Warden's July 1st e-mail was the first indication that I received that my correspondence was not being treated as privileged (other than the fact that some of the letters and postcards I received from detainees contained redactions, which I understand is permissible even with legal mail sent pursuant to applicable protective orders).

39.   As Petitioner's retained counsel, I have never authorized Lt. Col. Acuff to meet with, speak with, or otherwise communicate with, Petitioner.

40.   I have never been permitted to travel to Guantánamo Bay to meet with Petitioner, Mr. al-Nashiri, or any of the detainees who have asked to meet with me.

41.   I applied for a top secret security clearance in March of 2008.   I am a Distinguished Graduate and Graduate with Honors of the United States Air Force Academy.  I am a graduate of the United States Air Force's prisoner of war training.  I am an honorably discharged veteran of the United States Air Force.  I currently have a secret security clearance.

42.   Subsequent to my notifying the government of my attorney-client relationship with Petitioner in December of 2007, no one from the Department of Defense or any other

---

[13] Letters were sent to the detainees the same day because I send all correspondence to all detainees to three separate addresses.

agency took any steps to provide me with information regarding the security clearance application process or any information regarding visiting detainees at Guantánamo Bay, until I applied for my security clearance in March of 2008.

43.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_Scott L. Fenstermaker, Esq._
Scott L. Fenstermaker, Esq.

Dated:        New York, New York
              August 4, 2008

18

# EXHIBIT A

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT B

THE LAW OFFICES OF
**SCOTT L. FENSTERMAKER, P.C.**
500 FIFTH AVENUE, 40TH FLOOR
NEW YORK, NEW YORK 10110

OF COUNSEL

LINDA F. FENSTERMAKER, ESQ.

TELEPHONE (212) 302-0201
CELL (917) 817-9001
FACSIMILE (212) 302-0327
EMAIL scott@fenstermakerlaw.com
www.fenstermakerlaw.com

WESTCHESTER OFFICE
BY APPOINTMENT ONLY
50 MAIN STREET
WHITE PLAINS, NEW YORK 10606
TELEPHONE (914) 725-0955

December 14, 2007

**VIA CERTIFIED MAIL, RETURN RECEIPT**

Michael B. Mukasey, Esq.
Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

William J. Haynes, II, Esq.
General Counsel
Department of Defense
1600 Defense Pentagon, Room 3E833
Washington, DC 20301-1600

John Rizzo, Esq.
General Counsel
Central Intelligence Agency
Washington, DC 20505

Susan J. Crawford
c/o Colonel Steve David, Esq., USA
Franklin Court Building, Suite 2000E
1099 14th Street, N.W.
Washington, DC 20005

Brig. Gen. Thomas W. Hartmann, Esq., USAF
c/o Colonely Steve David, Esq., USA
Franklin Court Building, Suite 2000E
1099 14th Street, N.W.
Washington, DC 20005

Colonel Steve David, Esq., USA
Chief Defense Counsel
Franklin Court Building, Suite 2000E
1099 14th Street, N.W.
Washington, DC 20005

Lt. Col. William Britt
Office of the Chief Prosecutor
Office of Military Commissions
1610 Defense Pentagon
Washington, DC 20301-1610

Re:    Ahmed Khalfan Ghailani, Detainee 10012

Dear Sirs/Madam:

Please be advised that I represent Ahmed Khalfan Ghailani, detainee number 10012, Guantánamo Bay, Cuba in all matters relating to his detention in your custody. As his legal representative, I request that all questioning of Mr. Ghailani be discontinued. Please contact me if the convening authority for the military commissions refers charges against Mr. Ghailani, or if you have questions regarding this matter.

Messrs. Mukasey, Haynes, Rizzo, Ms. Crawford, General Hartmann, Colonel David, and Lt. Col. Britt
December 14, 2007
Page 2 of 2

  Please be advised that Ms. Crawford's and General Hartmann's copies of this letter are being sent care of Colonel David.  The reason for this procedure is that Colonel David's subordinates provided me with incorrect address information for Ms. Crawford and General Hartmann with respect to my earlier letter and subsequently declined to respond to communication seeking correct address information.

       Very truly yours,

       **The Law Offices of Scott L. Fenstermaker, P.C.**


    By:  _Scott L. Fenstermaker_
       Scott L. Fenstermaker, Esq.

cc:  Mr. Ahmed Khalfan Ghailani (in Swahili)

THE LAW OFFICES OF
### SCOTT L. FENSTERMAKER, P.C.
300 PARK AVENUE, 17TH FLOOR
NEW YORK, NEW YORK 10022
TELEPHONE (212) 302-0201
CELL (917) 817-9001
FACSIMILE (212) 302-0327
EMAIL scott@fenstermakerlaw.com
www.fenstermakerlaw.com

OF COUNSEL
———
LINDA F. FENSTERMAKER, ESQ.

WESTCHESTER OFFICE
BY APPOINTMENT ONLY
50 MAIN STREET
WHITE PLAINS, NEW YORK 10606
TELEPHONE (914) 725-0955

March 31, 2008

### VIA CERTIFIED MAIL, RETURN RECEIPT
### ALSO VIA E-MAIL AND FACSIMILE TO COLONELS DAVID AND MORRIS

Ms. Susan J. Crawford
Office of Military Commissions
1600 Defense Pentagon
Washington, DC 20301-1600

Brig. Gen. Thomas W. Hartmann, Esq., USAF
Office of Military Commissions
1600 Defense Pentagon
Washington, DC 20301-1600

Colonel Steve David, Esq., USA
Chief Defense Counsel
Franklin Court Building, Suite 2000E
1099 14th Street, N.W.
Washington, DC 20005

Colonel Lawrence Morris, Esq., USA
Office of the Chief Prosecutor
Office of Military Commissions
1610 Defense Pentagon
Washington, DC 20301-1610

Re:    Mr. Ahmed Khalfan Ghailani, Detainee Number 10012

Dear Sirs/Madam:

As I mentioned in my December 14, 2007 letter to each of you, among others, I represent Mr. Ahmed Khalfan Ghailani. It is my understanding that military commission charges have been preferred against Mr. Ghailani.

I ask that you provide me with the name and contact information for Mr. Ghailani's Detailed Defense Counsel, as soon as that information becomes available. Please similarly provide my contact information to Mr. Ghailani's Detailed Defense Counsel.

By letters dated February 14, 2008 and March 24, 2008, I requested an audience with Ms. Crawford and General Hartmann to discuss Mr. Mustafa bin Ahmed Hawsawi's capital referral. For the reasons stated in those two letters, I make a similar request on behalf of Mr. Ghailani to speak with both Ms. Crawford and General Hartmann regarding the referral of Mr. Ghailani's case as a capital matter.

As with Mr. Hawsawi, I am in possession of correspondence from Mr. Ghailani. I am informed by an Arabic interpreter that Mr. Ghailani has similarly authorized me to act on his behalf on all matters. Please contact me regarding the referral of charges at General Hartmann's earliest convenience.

Ms. Crawford, General Hartmann, Colonel David, and Colonel Morris
March 31, 2008
Page 2 of 2

Very truly yours,

**The Law Offices of Scott L. Fenstermaker, P.C.**

By: *Scott L. Fenstermaker*

Scott L. Fenstermaker, Esq.

cc:     Mr. Ahmed Khalfan Ghailani (in Swahili)

# EXHIBIT C

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT D

THE LAW OFFICES OF
## SCOTT L. FENSTERMAKER, P.C.
300 PARK AVENUE, 17TH FLOOR
NEW YORK, NEW YORK 10022
TELEPHONE (212) 302-0201
CELL (917) 817-9001
FACSIMILE (212) 302-0327
EMAIL scott@fenstermakerlaw.com
www.fenstermakerlaw.com

OF COUNSEL
_____
LINDA F. FENSTERMAKER, ESQ.

WESTCHESTER OFFICE
BY APPOINTMENT ONLY
50 MAIN STREET
WHITE PLAINS, NEW YORK 10606
TELEPHONE (914) 725-0988

May 19, 2008

**VIA CERTIFIED MAIL, RETURN RECEIPT AND E-MAIL**
**ALSO VIA E-MAIL TO COLONELS DAVID AND MORRIS AND LT COL ACUFF**

Ms. Susan J. Crawford, Esq.                      Brig. Gen. Thomas W. Hartmann, Esq., USAF
Office of Military Commissions                    Office of Military Commissions
1600 Defense Pentagon                             1600 Defense Pentagon
Washington, DC 20301-1600                         Washington, DC 20301-1600

Re:    Mr. Ahmed Khalfan Ghailani, Detainee Number 10012
       My March 31, 2008 Letter

Dear Ms. Crawford and General Hartmann:

I write to follow up my March 31, 2008 letter to you and to Colonels David and Morris on behalf of my client, Ahmed Khalfan Ghailani. In that letter, I informed you that I represent Mr. Ghailani and asked to speak with you regarding Mr. Ghailani's capital referral. As you have both declined to either respond to or even acknowledge my request for a meeting, I assume that you are refusing my request to discuss Mr. Ghailani's matter. Your refusal opens doors for future challenges to the disposition of Mr. Ghailani's matter.

I understand that on April 24, 2008, a staff attorney with the Office of the Chief Defense Counsel was detailed to represent Mr. Ghailani, notwithstanding my December 14, 2007 and March 31, 2008 letters notifying you, and others, that I represent Mr. Ghailani. Furthermore, Mr. Ghailani's detailed defense counsel informs me that he has had several meetings with Mr. Ghailani, without seeking my permission.

In a criminal case, a defendant has the right to counsel of his choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). Furthermore, the ethical rules in the detailed defense counsel's jurisdiction of admission prohibit his speaking to Mr. Ghailani, absent my consent. *See* Tennessee Rules of Professional Conduct, Rule 4.2, a copy of which is attached, along with the advisory notes to Rule 4.2. The legal and ethical considerations involved in the appointment of detailed defense counsel and his various meetings with my client further complicate Mr. Ghailani's matter, particularly when one considers the consequences of the decisions Ms. Crawford must make.

I again urge you to contact me so that we may meet to discuss Mr. Ghailani's matter.

General Hartmann
May 19, 2008
Page 2 of 2

Very truly yours,

**The Law Offices of Scott L. Fenstermaker, P.**

By: _Scott L. Fenstermaker_

Scott L. Fenstermaker, Esq.

cc:    Colonel Steven David, Esq., USAR (via e-mail)
       Colonel Lawrence Morris, Esq., USAR (via e-mail)
       Lt Col Mike Acuff, Esq., USAR (via e-mail)
       Mr. Ahmed Khalfan Ghailani (in Swahili)

client and that the lawyer reasonably believes may be used by the client in furtherance of the crime or fraud.

[Adopted September 17, 2002, effective March 1, 2003.]

**Comments**

*Misrepresentation*

(1) A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts or law. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. A misrepresentation can also occur by a failure to act.

(2) This Rule refers to statements of fact. Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are in this category, as is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.

*Crime or Fraud by Client*

(3) Paragraphs (b) and (c) provide guidance for lawyers who discover that a client intends to or is engaging in criminal or fraudulent conduct, and in some cases may even have used the lawyer's services to assist them commit the crime or fraud. To avoid assisting the client with the crime or fraud, the lawyer must advise the client to refrain from or to rectify the consequences of the criminal or fraudulent act. If the client refuses or is unable to do so, the lawyer must withdraw from the representation of the client in the matter. Additionally, this Rule mandates limited disclosures—notice of withdrawal or disaffirmance of written work product—in circumstances in which such disclosure is necessary for the lawyer to prevent the client from using the lawyer's services in furtherance of the crime or fraud. To this limited extent, then, this Rule overrides the lawyer's duties in Rules 1.6, 1.8(b), and 1.9(c) prohibiting disclosure or use to the disadvantage of the client of information relating to the representation. Other than the disclosure mandated by this Rule, however, the lawyer must not reveal information relating to the representation unless permitted to do so by Rule 1.6.

(4) If a lawyer learns that a client intends to commit a crime or fraud under circumstances in which the lawyer will not assist the offense by remaining silent, paragraph (b) requires remonstration with the client against the crime or fraud and requires withdrawal if the client does not desist from the course of conduct in question. Although the lawyer is not required to reveal the client's intended or ongoing fraud, the lawyer is required to communicate the fact that he or she has withdrawn from the representation of the client to any person whom the lawyer reasonably believes knows of the lawyer's involvement in the matter and whose financial or property interests are likely to be damaged by the client's intended or ongoing misconduct. This communication is necessary to fully distance the lawyer from the client's misconduct. If the client's intended conduct is a crime, full disclosure of the crime is permitted by Rule 1.6(b), but such disclosure is not required by paragraph (b) of this Rule.

(5) In some cases, a lawyer will learn about a client's crime or fraud after he or she has innocently prepared and submit-

ted statements, opinions, or other materials to third parties who will be adversely affected if the client persists with his or her misconduct. If the lawyer was misled by the client, some of these statements, opinions or materials may be false or misleading. Even though accurate, they may be necessary for the accomplishment of the client's crime or fraud. This presents the lawyer with a dilemma. Without the consent of the client, the lawyer may not correct the statements, opinions, or materials. That would violate the prohibition against revealing information related to the representation of the client. Yet to do nothing would allow the client to use the lawyer's work in the client's ongoing effort to consummate the fraud. To resolve this dilemma, paragraphs (b) and (c) do not require disclosure of the crime or fraud but only requires that the lawyer effectively disengage from the crime or fraud by giving notice to affected persons of the lawyer's disaffirmance of the lawyer's work product that the lawyer reasonably believes may be used by the client in furtherance of the crime or fraud. See Rule 1.6(b) for the circumstances in which the lawyer is permitted to reveal information for the purposes of preventing the client's crime or fraud.

(6) This Rule does not apply if the lawyer learns of the client's crime or fraud after the lawyer's representation in the matter is concluded. In such circumstances, the lawyer must comply with Rules 1.6, 1.8(b), and 1.9(c) and may not make any disclosures concerning the client's crime or fraud unless permitted or required to do so by those Rules. *See, e.g.,* RPC 1.6(b)(2) (permitting disclosures to secure legal advice about compliance with these Rules); RPC 1.6(b)(3) (permitting disclosures to establish a defense to an allegation of misconduct); RPC 1.6(c)(1) (requiring disclosure "to prevent reasonably certain death or substantial bodily harm").

[Comment (6) adopted effective June 23, 2016.]

*Definitional Cross-References*

"Consult" and "Consultation" See RPC 1.0(c)

"Fraud" and "Fraudulent" See RPC 1.0(e)

"Knowingly" and "Knows" See RPC 1.0(f)

"Material" See RPC 1.0(g)

"Reasonably Believes" See RPC 1.0(j)

## Rule 4.2  Communication With a Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

[Adopted September 17, 2002, effective March 1, 2003.]

**Comments**

(1) This Rule contributes to the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship, and the uncounseled disclosure of information relating to the representation.

(2) This Rule applies to communications with any person, whether or not a party to a formal adjudicative proceeding,

337

contract, or negotiation, who is represented by counsel concerning the matter to which the communication relates. The Rule applies even though the represented person initiates or consents to the communication. A lawyer must immediately terminate communication with a person if, after commencing communication, the lawyer learns that the communication is not permitted by this Rule.

(3) In the case of a represented organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with a member of the governing board, an officer or managerial agent or employee, or an agent or employee who supervises or directs the organization's lawyer concerning the matter, has authority to contractually obligate the organization with respect to the matter, or otherwise participates substantially in the determination of the organization's position in the matter.

(4) If an agent or employee of an organization is represented in the matter by his or her own counsel, consent by that counsel will be sufficient for purposes of this Rule. Consent of the organization's lawyer is not required for communication with a former agent or employee. See Rule 4.4 regarding the lawyer's duty not to violate the organization's legal rights by inquiring about information protected by the organization's attorney-client privilege or as work-product of the organization's lawyer. In communicating with a current or former agent or employee of an organization, a lawyer shall not solicit or assist in the breach of any duty of confidentiality owed by the agent to the organization. See RPC 4.4.

(5) This Rule does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the subject matter of the representation. For example, the existence of a controversy between a government agency and a private party, or between two private parties, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter, such as additional or different unlawful conduct not within the subject matter of the representation. Nor does this Rule preclude a lawyer from communicating with a person who seeks a second opinion about a matter in which the person is represented by another lawyer. Also, parties to a matter may communicate directly with each other.

(6) Communications with represented persons may be authorized by specific constitutional or statutory provisions, by rules governing the conduct of proceedings, by applicable judicial precedent, or by court order. Communications authorized by law, for example, may include communications by a lawyer on behalf of a client who is exercising a constitutional or other legal right to communicate with a governmental official having the power to redress the client's grievances.

(7) By virtue of its exemption of communications authorized by law, this Rule permits a prosecutor or a government lawyer engaged in a criminal or civil law enforcement investigation to communicate with or direct investigative agents to communicate with a represented person prior to the represented person being arrested, indicted, charged, or named as a defendant in a criminal or civil law enforcement proceeding against the represented person. A civil law enforcement investigation is one conducted under the government's police or regulatory power to enforce the law. Once a represented person has been arrested, indicted, charged, or named as a defendant in a criminal or civil law enforcement proceeding, however, prosecutors and government lawyers must comply with this Rule. A represented person's waiver of the consti-

tutional right to counsel does not exempt the prosecutor from the duty to comply with this Rule.

(8) In the event the person with whom the lawyer communicates is not known to be represented by counsel in the matter, the lawyer's communications are subject to Rule 4.3.

[Comment (7) amended April 29, 2003, effective June 1, 2003.]

#### Definitional Cross-References

"Knows" See RPC 1.0(f)

## Rule 4.3 Dealing With an Unrepresented Person

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are, or have a reasonable possibility of being, in conflict with the interests of the client.

[Adopted September 17, 2002, effective March 1, 2003.]

#### Comments

(1) An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client. In order to avoid a misunderstanding, a lawyer will typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person. For misunderstandings that sometimes arise when a lawyer for an organization deals with an unrepresented constituent, see Rule 1.13(d).

(2) The Rule distinguishes between situations involving unrepresented persons whose interests may be adverse to those of the lawyer's client and those in which the person's interests are not in conflict with the client's. In the former situation, the possibility that the lawyer will compromise the unrepresented person's interests is so great that the Rule prohibits the giving of any advice, apart from the advice to obtain counsel. Whether a lawyer is giving impermissible advice may depend on the experience and sophistication of the unrepresented person, as well as the setting in which the behavior and comments occur. This Rule does not prohibit a lawyer from negotiating the terms of a transaction or settling a dispute with an unrepresented person. So long as the lawyer has explained that the lawyer represents an adverse party and is not representing the person, the lawyer may inform the person of the terms on which the lawyer's client will enter into an agreement or settle a matter, prepare documents that require the person's signature, and explain the lawyer's own view of the meaning of the document or the lawyer's view of the underlying legal obligations.

#### Definitional Cross-References

"Knows" See RPC 1.0(f)

"Reasonable" See RPC 1.0(i)

"Reasonabl...

**Rule 4.4**
**Person**

In represe...

(a) use in...
other than...
person or k...
dence that vi...

(b) threat...
offer or to ap...
for the purp...
matter.

[Adopted Sept...

Responsibili...
the interests...
responsibility...
rights of thir...
such rights, bu...
obtaining evid...
trusions into...
lawyer relatio...
record a conv...
doing so woul...
iting such rec...
secret recordi...
purpose other...
being recorde...
8.4(c), howeve...
misled anothe...
was not being...
does not violat...
est or deceitfu...
conduct prejud...

[Comment am...

"Knowingly"...
"Substantial...

**CHAP...**
**DEI**
**SE**

**Rule 5.1** ...
aging ...

(a) A par...
individually...
comparable...
make reason...
effect measu...
lawyers in t...
sional Condu...

(b) A law...
over another...
ensure that ...
Professional...

# EXHIBIT E

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT F

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT G

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT H

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT I

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT J

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT K

MATERIAL UNDER SEAL AND FOR *IN CAMERA* REVIEW DELETED

# EXHIBIT L

THE LAW OFFICES OF
## SCOTT L. FENSTERMAKER, P.C.
300 PARK AVENUE, 17TH FLOOR
NEW YORK, NEW YORK 10022
TELEPHONE (212) 302-0201
CELL (917) 817-9001
FACSIMILE (212) 302-0327
EMAIL scott@fenstermakerlaw.com
www.fenstermakerlaw.com

OF COUNSEL

LINDA F. FENSTERMAKER, ESQ.

WESTCHESTER OFFICE
BY APPOINTMENT ONLY
50 MAIN STREET
WHITE PLAINS, NEW YORK 10606
TELEPHONE (914) 725-0955

June 23, 2008

**VIA CERTIFIED MAIL, RETURN RECEIPT AND E-MAIL**

Susan J. Crawford, Esq.
Office of Military Commissions
1600 Defense Pentagon
Washington, DC 20301-1600

Brig. Gen. Thomas W. Hartmann, JAGC, USAFR
Office of Military Commissions
1600 Defense Pentagon
Washington, DC 20301-1600

Re:    Mr. Ahmed Khalfan Ghailani, Detainee Number 10012

Dear Ms. Crawford and General Hartmann:

I write on behalf of my client, Ahmed Khalfan Ghailani, to follow up my March 31, 2008, May 19, 2008 and June 9, 2008 requests for a meeting and to bring a matter of concern to your attention.

As you are aware, Lt Col Mike Acuff, JAGC, USAR, is currently detailed as associate counsel to Mr. Ghailani. *See* 10 U.S.C. 949c(b)(5); *see also* Rule 502(d)(2) of the Rules for Military Commissions ("R.C.M."); *see also* Rule 502(d)(6) of the R.C.M. It is also my understanding, from speaking with Lt Col Acuff and reviewing court documents, that Lt Col Acuff is also detailed as assistant defense counsel to Khalid Sheikh Mohammed. Lt Col Acuff's dual assignments present a conflict of interest and arguably affect Mr. Ghailani's ability to get a fair hearing, either before the military commissions, or in the United States District Court for the Southern District of New York, 98 CR 1023 (KTD).

The conflict stems from Messrs. Ghailani's and Mohammed's apparent close association with one another during the period of the alleged crimes and conspiracy. Mr. Ghailani was apparently a self-admitted document (passport) preparer for al Qaeda. *See* Page 12 of 19 of the transcript of his CSRT hearing. In addition, Mr. Ghailani apparently admits having met with Osama bin Laden and Mr. Mohammed in Afghanistan at some point between 1998 and 2001. *See* Page 16 of 19 of his CSRT transcript. Mr. Ghailani has apparently admitted that he was with al Qaeda in Afghanistan. *See* Page 14 of 19 of his CSRT transcript. While Mr. Ghailani was in Pakistan, he may have stayed with one of Mr. Mohammed's relatives. *See* Page 16 of 19 of his CSRT hearing transcript.

Ms. Crawford and General Hartmann
June 23, 2008
Page 2 of 4

        At the same time that Mr. Ghailani was apparently in Afghanistan preparing passports for al Qaeda, Mr. Mohammed was allegedly in Afghanistan planning the September 11th attacks. Hence, under the government's theory, Mr. Ghailani is a potential codefendant in the September 11th matter. Similarly, news reports and government allegations indicate that Mr. Ghailani and Mr. Mohammed were both in Pakistan at the same time after the United States invaded Afghanistan in the Fall of 2001. During the time that Mr. Ghailani and Mr. Mohammed were in Pakistan, Mr. Mohammed was allegedly the chief of external operations for al Qaeda. During this same period of time, Mr. Ghailani may have been preparing documents in furtherance of al Qaeda's external operations. The conflict is clear and likely not the proper subject of a waiver. *See Wheat v. United States*, 486 U.S. 153, 164 (1988) (presumption in favor of counsel of one's choice can be overcome by not only "a demonstration of actual conflict but by a showing of a serious potential for conflict"). Here, Lt. Col. Acuff is not Mr. Ghailani's counsel of choice, I am.

        I understand that Lt Col Acuff has met with Mr. Ghailani, notwithstanding the fact that Lt Col Acuff never obtained my permission, as Mr. Ghailani's retained civilian defense counsel, to do so. In fact, Lt Col Acuff recently met with Mr. Ghailani on a number of occasions after I specifically directed him not to meet with Mr. Ghailani. In addition, in light of the fact that Lt Col Acuff has appeared as counsel of record for Mr. Mohammed in at least two military tribunals, it is also likely that Lt Col Acuff has met with Mr. Mohammed. Other than the last meeting between Mr. Ghailani and Lt Col Acuff, Lt Col Acuff has refused to inform me of the substance of his meeting(s) with Mr. Ghailani, as Lt Col Acuff claims that anything my client says is Top Secret. According to Lt Col Acuff, during his most recent meeting with Mr. Ghailani, which again occurred in direct contravention of my explicit written instructions to Lt Col Acuff, Lt Col Acuff and Mr. Ghailani apparently discussed Lt Col Acuff's conflict of interest. Remarkably, according to Lt Col Acuff, Mr. Ghailani assured me that there was, in fact, no conflict of interest between Mr. Ghailani and Mr. Mohammed.[1] Lt Col Acuff did not explain to me how Mr. Ghailani arrived at this highly suspect conclusion and the role that Lt Col Acuff may have played in Mr. Ghailani's belief that no conflict exists.

        In addition to discussing Lt Col Acuff's conflict of interest, Lt Col Acuff claims that Mr. Ghailani has, like the September 11th defendants, decided to proceeding without counsel.[2] This information, imparted to conflicted counsel during an unauthorized meeting, raises many questions, few of which reflect positively on Lt Col Acuff, the Office of the Chief Defense Counsel, or the Office of Military Commissions. I am in possession of correspondence from Mr. Ghailani which leads me to believe that Mr. Ghailani never requested to meet with detailed defense counsel and does not consent to being represented by an attorney associated with the United States military. Lt Col Acuff's involvement in Mr. Ghailani's matter, while serving in conflicting roles and in opposition to retained counsel's explicit directions, is unacceptable and should cease. Furthermore, it will serve as the basis of litigation that is likely to prove embarrassing for Lt. Col. Acuff, the Office of the Chief Defense Counsel, and the Office of Military Commissions. *See* 10 U.S.C. 949c(b)(5); *see also* Rule 502(d)(2) of the Rules for

---

[1] Lt. Col. Acuff did not explain to me under what exception to the security classification rules this information falls.
[2] *See* Footnote 1 above.

Ms. Crawford and General Hartmann
June 23, 2008
Page 3 of 4

Military Commissions ("R.C.M."); *see also* Rule 502(d)(6) of the R.C.M.; *see also* Paragraph (F) of the Discussion to Rule 502(d)(6) of the R.C.M.

I urge you to consider the ramifications of Lt Col Acuff's unauthorized and ethically suspect meetings with Mr. Ghailani as you look to proceed with referring Mr. Ghailani's matter to a military commission. Lt Col Acuff's involvement is likely to be a source of litigation, both at the trial level, and at the appellate level, should an appeal be necessary. Not only will Lt Col Acuff's involvement prove problematic before a military commission, but it will also be the source of litigation in the Southern District of New York, at the appropriate time. While the Office of the Chief Defense Counsel seems unperturbed by Lt Col Acuff's involvement in Mr. Ghailani's matter, the Justice Department will likely recognize the problems generated by this untenable situation. Mr. Ghailani should not be prejudiced by this ethically unsound behavior.

Today I received an e-mail from Colonel Steven David, JAGC, USAR, the Chief Defense Counsel. In his e-mail, Colonel David directs me to "not make any requests of LTC Acuff." *See* 10 U.S.C. 949c(b)(5); *see also* Rule 502(d)(2) of the Rules for Military Commissions ("R.C.M."); *see also* Rule 502(d)(6) of the R.C.M.; *see also* Paragraph (F) of the Discussion to Rule 502(d)(6) of the R.C.M. Colonel David also informs me that "[a]s far as I am concerned, you do not represent Mr. Ghailani. He neither wants to see you nor wants you to represent him." Colonel David's assessment of Mr. Ghailani's wishes is remarkable, in light of the fact that Colonel David has no relationship with Mr. Ghailani of any kind, the only information he could possibly have regarding Mr. Ghailani's wishes comes from his subordinate whom he improperly and unethically directed to interfere with my relationship with Mr. Ghailani, and Colonel David, who is supposed to be supervising Lt. Col. Acuff, is ordering his subordinate to engage in ethically unsound behavior. In short, you have a problem on your hands and the problem is not going away.

You are undoubtedly aware of Ammar al-Baluchi's behavior at the June 5, 2008 September 11th arraignment. You may not be aware that the behavior Mr. al-Baluchi exhibited during that arraignment is likely to repeat itself with other detainees, in other matters, and throughout these proceedings. You can continue to ignore this problem, to your ultimate embarrassment, or you can contact me immediately, so that we may meet in person in your offices in the Washington area or at another location of our mutual agreement, and determine the best course of action going forward. I suggest you contact me at your earliest convenience to discuss my, and the detainees', concerns.

I urge you to thoroughly consider the posture of Mr. Ghailani's case and the arguably irreparable harm he has already suffered at the hands of the Office of the Chief Defense Counsel. As I mentioned in my March 31, 2008, May 19, 2008 and June 9, 2008 letters, I look forward to discussing Mr. Ghailani's matter with you.

Ms. Crawford and General Hartmann
June 23, 2008
Page 4 of 4

Very truly yours,

**The Law Offices of Scott L. Fenstermaker, P.C.**

By: *Scott L. Fenstermaker*
Scott L. Fenstermaker, Esq.

cc:    Mr. Ahmed Khalfan Ghailani (via certified mail, return receipt)
Col. Steven David, JAGC, USAR (via e-mail)
Lt. Col. Mike Acuff, JAGC, USAR (via e-mail)
Randall T. Coyne, Esq. (via e-mail)

# EXHIBIT M



**LEGAL ADVISOR**

**OFFICE OF THE SECRETARY OF DEFENSE**
OFFICE OF MILITARY COMMISSIONS
1600 DEFENSE PENTAGON
WASHINGTON, DC 20301-1600

June 25, 2008

Scott L. Fenstermaker, Esq.
300 Park Avenue, 17th Floor
New York, New York 10022

Dear Mr. Fenstermaker:

I am writing in response to your letter of June 9, 2008, asking to meet with Mrs. Susan Crawford, the Convening Authority, to discuss the referral of charges against Mr. Ghailani. For the reason discussed below, we must deny your request.

In an earlier letter dated April 11, 2008, you indicated there was some question about whether you represented Mr. Ghailani. You asked for assistance from the military commission staff in reviewing certain letters.

As you know, the Military Commissions Act, 10 U.S.C. § 949c(b)(3), and Rule for Military Commissions (R.M.C.) 502(d), set the standards for who is eligible to serve as counsel for detainees. The Regulation for Trial by Military Commission, ¶ 9-1.a.11, provides that the Chief Defense Counsel shall administer the civilian defense counsel pool and make qualification determinations. Recently, this office inquired of the Chief Defense Counsel whether you were counsel for Mr. Ghailani. He advised that you were not representing Mr. Ghailani at this time.

Because you are not counsel for Mr. Ghailani, it would be inappropriate for Mrs. Crawford to discuss this case with you or to consider any matters your submit on his behalf. If you feel the Chief Defense Counsel is incorrect about your representation, you should pursue that issue with him.

THOMAS W. HARTMANN
Brigadier General, U.S. Air Force
Legal Advisor to the Convening Authority
for Military Commissions

Printed on  Recycled Paper

# EXHIBIT N

**Scott Fenstermaker**

| | |
|---|---|
| **From:** | Warden, Andrew (CIV) [Andrew.Warden@usdoj.gov] |
| **Sent:** | Tuesday, July 01, 2008 11:43 AM |
| **To:** | scott@fenstermakerlaw.com |
| **Subject:** | Guantanamo Bay mail |

Mr. Fenstermaker:

I am one of the attorneys representing the government in the Guantanamo Bay habeas litigation. We have been informed by Joint Task Force Guantanamo that you recently sent letters to Abd al-Rahim al-Nashiri (ISN 10015) and Ahmed Ghailani (ISN 10012). As you may be aware, there are two systems by which detainees send and receive mail at Guantanamo. First, most mail sent to Guantanamo detainees is processed in a non-privileged fashion. That is, the mail is screened and reviewed by military authorities before delivery to the intended recipient. Second, a system for privileged legal mail between detainees and eligible counsel exists under the auspices of various protective orders entered by the U.S. District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit. That system is available only in cases in which the protective orders have been entered and is subject to requirements and restrictions set out in the orders.

Because you are not authorized to send or receive privileged mail pursuant to any appropriately entered protective orders, the mail you recently sent Messrs. Al-Nashiri and Ghailani would ordinarily be processed in accordance with the procedures established for non-privileged mail unless you request that the mail be returned to you. Because that mail is marked privileged, it has not been reviewed or otherwise processed at this point. Please let me know how you would like to proceed.

Best regards,

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Tel: 202-616-5084
Fax: 202-616-8470

1

# EXHIBIT O

**Scott Fenstermaker**

| | |
|---|---|
| **From:** | Scott Fenstermaker [scott@fenstermakerlaw.com] |
| **Sent:** | Tuesday, July 01, 2008 2:41 PM |
| **To:** | 'Warden, Andrew (CIV)' |
| **Subject:** | RE: Guantanamo Bay mail |

Mr. Warden,

Thank you for your July 1st e-mail informing me of the dual-track mail system with respect to Guantanamo Bay detainees. As you are likely aware, I have been corresponding with a number of detainees at Guantanamo Bay since the summer of 2007. You are also likely aware that I am counsel of record for both Mr. Ghailani and Mr. al-Nashiri in pending court matters in the Southern District of New York, 98 CR 1023 (KTD) (Ghailani), United States District Court for the District of Columbia, 08 -1085 (al-Nashiri) and docket number unknown (Ghailani), and the United States Court of Appeals for the District of Columbia Circuit, 08-1007 (al-Nashiri) and 08-1209 (Ghailani). In addition, I am counsel of record for Mr. Ghailani in his military commissions matter and will be shortly counsel of record in Mr. al-Nashiri's military commissions' matter.

You are free to process my mail to my clients in whatever fashion you like, so long as they get it. I will reserve my arguments regarding the privileged nature of the correspondence for the appropriate forum. I have sent numerous letters and packages to Messrs al-Nashiri and Ghailani, and a number of the other so-called "high value" detainees in the past in the same fashion as the correspondence to which you refer. Until now, no one has ever objected to my correspondence or its privileged nature. The timing of your objection raises a number of issues, particularly in light of the recent actions of the Office of the Chief Defense Counsel to the military commissions.

Your refusal to process my correspondence to these detainees would raise numerous constitutional issues, including, among others, right to counsel, due process and speedy trial concerns. Furthermore, in light of the Office of the Chief Defense Counsel's interference with my relationship with Mr. Ghailani, I will consider any such interference as a cooperative effort between the Justice Department and the Department of Defense. Such effort would not only raise constitutional concerns, but ethical concerns as well.

In case the above was not clear, I am counsel of record for Mr. Ghailani in a pending criminal indictment in the United States District Court for the Southern District of New York. Should you refuse to forward my mail to him, I will immediately take steps to alert that court and ask for a conference in which I will request permission to file the appropriate motions objecting to your holding my client incommunicado.

Let me know if you have any questions.

Scott L. Fenstermaker, Esq.

**From:** Warden, Andrew (CIV) [mailto:Andrew.Warden@usdoj.gov]
**Sent:** Tuesday, July 01, 2008 11:43 AM
**To:** scott@fenstermakerlaw.com
**Subject:** Guantanamo Bay mail


Mr. Fenstermaker:

I am one of the attorneys representing the government in the Guantanamo Bay habeas litigation. We have been informed by Joint Task Force Guantanamo that you recently sent letters to Abd al-Rahim al-Nashiri (ISN 10015) and Ahmed Ghailani (ISN 10012). As you may be aware, there are two systems by which detainees send and receive mail at Guantanamo. First, most mail sent to Guantanamo detainees is processed in a non-privileged fashion. That is, the mail

1

is screened and reviewed by military authorities before delivery to the intended recipient. Second, a system for privileged legal mail between detainees and eligible counsel exists under the auspices of various protective orders entered by the U.S. District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit. That system is available only in cases in which the protective orders have been entered and is subject to requirements and restrictions set out in the orders.

Because you are not authorized to send or receive privileged mail pursuant to any appropriately entered protective orders, the mail you recently sent Messrs. Al-Nashiri and Ghailani would ordinarily be processed in accordance with the procedures established for non-privileged mail unless you request that the mail be returned to you. Because that mail is marked privileged, it has not been reviewed or otherwise processed at this point. Please let me know how you would like to proceed.

Best regards,

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Tel: 202-616-5084
Fax: 202-616-8470

# Exhibit P

TO:
THE LAW OFFICES OF
SCOTT L. FENSTERMAKER PC
300 PARK AVENUE, 17TH FLOOR
NEW YORK, NEW YORK 10022

FROM:
OFFICE OF STAFF JUDGE ADVOCATE
JTF GTMO SJA
APO AE 09360

Enclosed are sixteen (16) envelopes which were submitted to our office via regular mail and opened upon receipt for serialization and delivery. These envelopes were opened according to our standard procedure because they were not marked with the required warning statement indicating that their contents were privileged. Once opened, several of the cover letters reflected the words "Privileged and Confidential, Attorney-Client Privilege". Following this discovery, these materials were immediately returned to their respective envelopes and held in our office for safekeeping. Guidance as to what to do with these materials was sought through the Office of General Counsel (OGC), which directed that they be returned to you. The envelopes are enclosed with this letter.

Sincerely,

GREG MUSSELMAN
MAJ, JA, USA
Assistant Staff Judge Advocate