## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AHMED KHALFAN GHAILANI, | ) | |
| Petitioner | ) | |
| v. | ) | Civil Action No. 08-cv-1190 (RJL) |
| ROBERT M. GATES, et al. | ) | |
| Respondents | ) | |

## RESPONDENTS' RESPONSE TO PETITIONER'S RESPONSE TO JULY 25, 2008 FILING

### PRELIMINARY STATEMENT

Two different lawyers claim to represent petitioner, a Guantanamo Bay detainee, in this proceeding. The case was filed by one attorney, Scott L. Fenstermaker. Another attorney, David Remes, has moved to strike Mr. Fenstermaker's appearance and to have Mr. Remes noted as counsel for petitioner. Respondents take no position on the merits of the representation question, but file the present response to Mr. Fenstermaker's opposition to the motion to note that certain suggestions made by Mr. Fenstermaker's opposition are inappropriate and should be rejected by the Court. Most significantly, Mr. Fenstermaker has proposed to have this Court conduct evidentiary proceedings in this case inquiring into the interest of petitioner in having one or another lawyer represent him. Particularly because of petitioner's prior detention in the custody of the Central Intelligence Agency as part of a still highly classified program, any such evidentiary proceeding would be inappropriate. The Court should resolve the representation question that is before it based on the voluminous materials the competing attorneys have already submitted, and should not grant any other relief that Mr. Fenstermaker seems to be

- 1 -

seeking against respondents.

## BACKGROUND

**I.     The Present Motion Implicates a Highly Classified Government Program**

Petitioner is one of fourteen individuals who in September 2006 were transferred to

Guantanamo to the custody of the Department of Defense ("DoD") from the custody of the

Central Intelligence Agency ("CIA"). The CIA had previously held petitioner as part of a

special, limited program operated by that agency to capture; detain (in secret, off-shore

facilities);

and interrogate key terrorist leaders and operatives in order to help prevent terrorist attacks.

*See* President George W. Bush, Speech: President Discusses Creation of Military Commissions

to Try Suspected Terrorists (September 6, 2006) (copy attached as Exhibit 2) (acknowledging

CIA program);[1] *see also* Declaration of Marilyn A. Dorn (Oct. 26, 2006) ¶¶ 7, 10, 16 ("Dorn

Decl.") (attached as Exhibit 1) (discussing CIA program).[2] The importance of the program to

national security interests cannot be overstated. Information obtained through the program has

provided the United States with one of the most useful tools in combating terrorist threats to the

national security. Dorn Decl. ¶ 11. It has shed light on probable targets and likely methods for

attacks on the United States, has led to the disruption of terrorist plots against the United States

and its allies, and has gathered information that has played a role in the capture and questioning

of senior Al Qaeda operatives. *Id.* Many aspects of the terrorist detainee program remain

---

[1] The text of the President's speech is available at
<http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html>.

[2] The Dorn Declaration was originally filed in *Khan v. Bush*, No. 06-CV-1690 (RBW)
(D.D.C.).

classified as TOP SECRET/Sensitive Compartmented Information (TS/SCI). *Id.* For example, information such as where detainees have been held, the details of their confinement, interrogation methods, and other operational details constitute or involve TS/SCI information. *Id.*

Under Executive Order 12958, as amended,[3] the anticipated severity of the damage to national security resulting from disclosure determines which of three classification levels is applied to information. Thus, if an unauthorized disclosure of information reasonably could be expected to cause damage to the national security, that information may be classified as CONFIDENTIAL; serious damage may be classified as SECRET; and exceptionally grave damage may be classified as TOP SECRET. *Id.* § 1.2. Section 4.3 of Executive Order 12958 further provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure. These special access programs relating to intelligence are called Sensitive Compartmented Information, or SCI, programs. *See* Dorn Decl. ¶ 9. As noted above, many aspects of the terrorist detainee program are classified at the TS//SCI level.

**II.    Scott L. Fenstermaker's Response to the Motion**

The petition in this case was filed on July 10, 2008, by attorney Scott L. Fenstermaker, purportedly on behalf of the named petitioner, Ahmed Khalfan Ghailani, who is detained as an enemy combatant at Guantanamo Bay. Petitioner, who is identified by Internment Serial Number (ISN) 10012, is one of fourteen individuals who in September 2006 were transferred to

---

[3]*See* Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).

Guantanamo to the custody of the Department of Defense ("DoD") from the custody of the

Central Intelligence Agency ("CIA"). *See* U.S. Department of Defense, Combatant Status

Review Tribunals / Administrative Review Boards,

http://www.defenselink.mil/news/Combatant_Tribunals.html (last visited Aug. 14, 2008).

Petitioner Ghailani is also named as a petitioner in an action seeking Court of Appeals review of

his designation as an enemy combatant under the Detainee Treatment Act. *Ghailani v. Gates*,

No. 08-1209 (D.C. Cir. filed May 29, 2008).

On July 25, 2008, attorney David H. Remes entered an appearance in this case on behalf

of petitioner and filed a motion for an order striking Mr. Fenstermaker's notice of appearance,

naming Mr. Remes counsel for the petitioner, and barring Mr. Fenstermaker from making further

filings as petitioner's counsel in this matter. Appearance (dkt. no. 6); Mot. to (1) Strike Scott L.

Fenstermaker's Unauthorized Notice of Appearance as Pet'r's Counsel in this Matter, (2) Name

David H. Remes as Pet'r's Counsel in this Matter, and (3) Bar Mr. Fenstermaker from Making

any Further Filings Holding Himself Out as Pet'r's Counsel in this Matter (dkt. no. 7).

On August 4, 2008, Mr. Fenstermaker filed a response opposing the motion filed by Mr.

Remes. The response included a request for additional relief from the Court. Specifically, Mr.

Fenstermaker proposed that the Court hold a hearing in Washington, D.C., or at Guantanamo

Bay, or otherwise afford Mr. Fenstermaker an opportunity to take sworn testimony from the

petitioner and the military lawyers assigned to represent the petitioner in military commission

proceedings. *See* Fenstermaker Resp. at 1–2, 31–32. In his opposition to Mr. Remes' motion,

Mr. Fenstermaker further sought various orders to permit or facilitate communications between

Mr. Fenstermaker and the petitioner, even though he has not filed any motion seeking the entry

of a protective order governing counsel access such as the orders entered generally in the

Guantanamo Bay habeas litigation. No order of the sort entered by the Court of Appeals in *Khan*

*v. Gates*, No. 07-1324 (D.C. Cir. Oct. 12, 2007), dealing with counsel access in the particularly

sensitive context of Guantanamo Bay detainees who are former CIA detainees has been entered

in this case.  Among the specific relief sought by Mr. Fenstermaker are orders compelling

respondents to either permit him to meet with the petitioner or report on the status of Mr.

Fenstermaker's application for a security clearance; to deliver correspondence from Mr.

Fenstermaker to the petitioner; and to permit Mr. Fenstermaker to communicate with the

petitioner through legal mail channels. *See* Fenstermaker Resp. at 2, 32. Mr. Fenstermaker

further sought a writ of prohibition preventing respondents from referring war crimes charges

against petitioner pending resolution of the dispute regarding the petitioner's representation.

Finally, Fenstermaker sought to file certain materials under seal for in camera ex parte review by

the Court. *See* Fenstermaker Resp. at 3.

## ARGUMENT

I.     **Evidentiary Proceedings Are Not Necessary to Evaluate Mr. Fenstermaker's Claim**
       **That He Represents the Petitioner and Would Be Inappropriate in the Present**
       **Circumstances.**

Because of petitioner's involvement in the CIA program, it is likely petitioner possesses,

and will be able to transmit to counsel, information that would be classified at the TOP

SECRET/SCI level, such as detention locations and other operational details, or information that

would warrant equivalent treatment or other special handling while petitioner remains in United

States custody. *See* Dorn Decl. ¶¶ 8, 10, 16. For example, as explained in the Dorn Declaration,

improper disclosure of operational details about the program, such as the locations of CIA

detention facilities, would put United States allies at risk of terrorist retaliation and betray

relationships that are built on trust and are vital to efforts against terrorism. *See id.* ¶ 12; *see also*

Declaration of Wendy M. Hilton (Mar. 28, 2006) ¶¶ 12-20 (attached as Exhibit 3) ("Hilton

Decl.").[4] Improper disclosure of other operational details, such as interrogation methods, could

also enable terrorist organizations and operatives to adapt their training to counter such methods,

thereby obstructing the CIA's ability to obtain vital intelligence that could disrupt future planned

terrorist attacks. Dorn Decl. ¶ 13; Hilton Decl. ¶¶ 19-21. The appropriate and adequate

protection of information that petitioner may possess and may transmit to counsel, therefore, is

imperative.

In any event, the Court should not hold evidentiary proceedings regarding the conflicting

claims of attorneys seeking to represent the petitioner. Such proceedings would not illuminate

the key issue presently before the Court, which is whether Mr. Fenstermaker has any existing

representation relationship with the petitioner. If Mr. Fenstermaker cannot establish that he has

an existing relationship with the petitioner, it would not be appropriate for the Court to order

such proceedings to permit Mr. Fenstermaker an opportunity to establish such a relationship or

to interfere with other attorneys' efforts to represent the petitioner.

The Court can and should resolve the issue of the petitioner's representation without

ordering further evidentiary proceedings. If, as Mr. Fenstermaker asserts, petitioner has

authorized Mr. Fenstermaker to represent him, then Mr. Fenstermaker should be able to establish

that fact without the kind of evidentiary proceedings he seeks. This is especially true given that

---

[4]The Hilton Declaration was originally filed in *Khan v. Gates*, No. 07-1324 (D.C. Cir.), in opposition to a motion to unseal TS/SCI filings in that Court.

Mr. Fenstermaker's claimed relationship with petitioner is based entirely on letters allegedly received from the petitioner—Mr. Fenstermaker avers that he has never spoken with or met with the petitioner and has communicated with the petitioner only through written correspondence. *See* Fenstermaker Resp. at 3–4; Decl. of Material Facts ¶ 4 (dkt. no. 10). It appears that Fenstermaker seeks to file certain documents under seal, but the cursory mention in Mr. Fenstermaker's filing of his interest in a sealing order, *see* Fenstermaker Resp. at 3, is not adequate to satisfy the requirements of Local Civil Rule 5.1(j), which requires that papers filed with the intention of being sealed be accompanied by a motion to seal.

On the other hand, if Mr. Fenstermaker is *not* currently authorized to represent petitioner, then there is no basis for permitting Mr. Fenstermaker to communicate with the petitioner or to seek relief on his behalf. An attorney who has no relationship with a detainee is not entitled to contact the detainee for the purpose of offering legal assistance to the detainee, to interfere with the efforts of other attorneys who represent or seek to represent the detainee, or for other reasons not rooted in any existing representation relationship. *Cf. Ukrainian-American Bar Ass'n v. Baker*, 893 F.2d 1374, 1380–82 (D.C. Cir. 1990) (rejecting bar association's assertion of a right to contact detained aliens for the purpose of offering legal services).

**II.    Access to and Communication with the Petitioner Should Be Governed By an Appropriate Protective Order, and Such Access Should Not be Afforded to Attorneys Who Have Not Established a Relationship with the Petitioner.**

For similar reasons, the Court should deny Mr. Fenstermaker's request for relief compelling respondents to afford Mr. Fenstermaker access to and communication with the petitioner. As the Supreme Court stated in *Boumediene v. Bush*, 128 S. Ct. 2229, 2276 (2008), "the Government [in the Guantanamo habeas cases] has a legitimate interest in protecting

sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible." *Boumediene v. Bush*, 128 S. Ct. 2229, 2276 (2008).[5] Here, "[a] protective order that allows individuals without the necessary security clearances access to TS/SCI information, or permits the use of procedures not appropriate for TS/SCI information, cannot possibly begin to adequately protect such information from unauthorized disclosure." Dorn Decl. ¶ 15.

Indeed, in recognition of the special classification-level issues presented in this case, special procedures to deal with the management and handling of TS/SCI information have been used in cases involving TS/SCI detainees, including petitioner, in litigation under the Detainee Treatment Act ("DTA") in the Court of Appeals. *See Khan v. Gates*, No. 07-1324 (D.C. Cir. Oct. 12, 2007) (per curiam order adopting stipulated SCI protective order). The procedures, inter alia, require an appropriate (TS/SCI) security clearance and include requirements for proper handling and transmission of TS/SCI information. *See* Emergency Stipulation to Immediate Entry of Interim Guantanamo SCI Protective Order, *Khan v. Gates*, No. 07-1324 (D.C. Cir. Oct. 12, 2007), Ex. A (stipulated SCI protective order adopted by the Court of Appeals). The procedures also include, consistent with the standard protective order regime in DTA cases in the Court of Appeals, monitoring and possible redaction by a DoD Privilege Team of legal mail going from

_____

[5]The *Boumediene* opinion is not the first instance in which the Supreme Court has recognized the responsibility of the Executive to safeguard and protect classified and other national security information adequately and the responsibility of courts to defer to protective measures the Executive deems appropriate. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 527-30 (1988) (authority to control access to classified information is constitutionally vested in the President as head of the Executive Branch and Commander in Chief and should not be intruded upon by the courts "[f]or reasons . . . too obvious to call for enlarged discussion"); *see also Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation.").

petitioner's counsel to petitioner in the case. *See* Emergency Stipulation to Immediate Entry of Interim Guantanamo SCI Protective Order Ex. A ¶ 4.B.

But the Court should not compel respondents to afford such access in the absence of a protective order, and under no circumstances should the Court compel respondents to afford such access to an individual such as Mr. Fenstermaker, who lacks an appropriate security clearance and has not yet demonstrated that he has an existing representation relationship with the petitioner.

**III.     Mr. Fenstermaker's Request for Other Relief Should Be Denied.**

Mr. Fenstermaker has asked for other forms of relief that should be denied.  For one thing, Mr. Fenstermaker's requests for relief against respondents are not made in a properly filed motion but are only piggybacked on an opposition to a motion filed by a party other than respondents, and without the conference statement required by Local Civil Rule 7(m). Furthermore, it makes no sense for the Court to grant relief requested by one of multiple competing counsel before the question of who represents petitioner has been resolved. Additionally, the specific forms of relief sought by Mr. Fenstermaker would be inappropriate. For example, courts should not exercise control over Executive Branch decisions regarding security clearances, as Mr. Fenstermaker seems to urge. *See, e.g., Dep't of the Navy v. Egan*, 484 U.S. 518, 526–30 (1988) (noting that security clearance decisions are discretionary in nature and fall into a sphere of national security and foreign policy issues in which "courts traditionally have been reluctant to intrude upon the authority of the Executive"). As another example, Mr. Fenstermaker's request for a writ of prohibition preventing respondents from referring charges against the petitioner in military commission proceedings seems to be without merit and

certainly should not be considered when made in an such an irregular fashion. *Cf. Hamdan v. Gates*, 2008 WL 2780911 at *6–*7 (D.D.C. 2008) (rejecting request for preliminary relief interfering with military commission proceedings pending civilian court proceedings). Besides, interfering with military commission proceedings would not in any way promote resolution of the present dispute regarding the representation of petitioner.

## CONCLUSION

For the reasons stated above, Respondents request that the Court reject the request for an evidentiary hearing and other relief contained in the response filed by Scott L. Fenstermaker.

Dated: August 14, 2008                     Respectfully submitted,

                                           GREGORY G. KATSAS
                                           Assistant Attorney General

                                           JOHN C. O'QUINN
                                           Deputy Assistant Attorney General


                                           */s/ James C. Luh*
                                           JOSEPH H. HUNT (D.C. Bar No. 431134)
                                           VINCENT M. GARVEY (D.C. Bar No. 127191)
                                           JUDRY L. SUBAR (D.C. Bar No. 347518)
                                           TERRY M. HENRY
                                           ANDREW I. WARDEN
                                           NICHOLAS A. OLDHAM (D.C. Bar No. 484113)
                                           JAMES C. LUH
                                           Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC  20530
                                           Tel:  (202) 514-4938
                                           Fax:  (202) 616-8460
                                           Attorneys for Respondents

# EXHIBIT  1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MAJID KHAN, *et al.*,                          )
                                               )
    Petitioners                           )
                                               )
    v.                                    )          Civil Action No. 06-CV-1690 (RBW)
                                               )
GEORGE W. BUSH,                                )
    President of the United States,       )
    *et al.*,                             )
                                               )
    Respondents.                          )
_____)

## DECLARATION OF MARILYN A. DORN, INFORMATION REVIEW OFFICER, CENTRAL INTELLIGENCE AGENCY

I, MARILYN A. DORN, hereby declare and say:

1. I am the Information Review Officer (IRO) for the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA). After serving one and a half years as Associate NCS/IRO, I was appointed to my current position on 1 August 2003.

2. The NCS is the organization within the CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities; conducting covert action; conducting liaison with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting clandestine technical collection; and coordinating CIA support to the Department of Defense. Specifically, the NCS is responsible for the conduct of foreign intelligence collection through the clandestine use of human sources.

3. The IRO is responsible for the review of records maintained by offices in the NCS that may be responsive to requests from the Department of Justice in criminal and civil litigation. As part of my official duties, I ensure that determinations such as the release or withholding of information related to the CIA are proper and do not jeopardize CIA interests, personnel, or facilities, and, on behalf of the Director of the CIA, do not jeopardize CIA intelligence activities, sources, or methods.

4. As a senior CIA official and under a written delegation of authority pursuant to section 1.3(c) of Executive Order 12958, as amended,[1] I hold original classification authority at the TOP SECRET level. Therefore, I am authorized to conduct classification reviews and to make original classification and declassification decisions.

5. Through the exercise of my official duties, I am generally familiar with this case. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

### Purpose of this Declaration

6. I understand that a Petition for Writ of Habeas Corpus has been filed on behalf of Majid Kahn and that petitioner's counsel has requested that the Court enter a standard protective order used in a number of previous cases involving detainees at the United States Naval Base in Guantanamo Bay, Cuba. Such protective orders are entered to establish the procedures that must be followed by petitioner's counsel and various other individuals who receive access to potentially classified national security information in connection with these cases. The purpose of this declaration is to inform the Court that

---

[1] (U) Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. See Exec. Order No. 12,958, 3 C.F.R. 333 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

the classified national security information likely to arise in this case is different and more sensitive than any of the previous cases involving detainees at Guantanamo Bay. Therefore, the standard protective order used in previous cases is insufficient to protect that information.

### The Classified National Security Information at Issue

7. On September 6, 2006, President George W. Bush delivered a speech in which he disclosed the existence of a secret CIA program to capture, detain, and interrogate key terrorist leaders and operatives in order to help prevent terrorist attacks. President Bush also disclosed that fourteen individuals formerly in CIA custody as part of the secret CIA program had been transferred to Department of Defense (DOD) custody at Guantanamo Bay. Petitioner was one of the fourteen individuals formerly in the secret CIA program, now detained by DOD at Guantanamo Bay.

8. While the President publicly disclosed that the fourteen individuals were detained and questioned outside the United States in a program operated by the CIA, he also explicitly stated that many specifics of the program, including where the detainees had been held, the details of their confinement, the employment of alternative interrogation methods, and other operational details could not be divulged and would remain classified. In fact, such details constitute and involve TOP SECRET, Sensitive Compartmented Information (SCI).

9. Under Executive Order 12958, as amended, the anticipated severity of the damage to national security resulting from disclosure determines which of three classification levels is applied to the information. Thus, if an unauthorized disclosure of information reasonably could be expected to cause *damage* to the national security, that

information may be classified as CONFIDENTIAL; *serious damage* may be classified as SECRET; and *exceptionally grave damage* may be classified as TOP SECRET. Executive Order 12958, section 4.3, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure. This section further provides that the Director of the CIA is responsible for establishing and maintaining special access programs relating to intelligence activities, sources, and methods. These special access programs relating to intelligence are called Sensitive Compartmented Information (SCI) programs.

10. Information relating to the CIA terrorist detention program has been placed in a TOP SECRET//SCI program to enhance protection from unauthorized disclosure. Because Majid Kahn was detained by CIA in this program, he may have come into possession of information, including locations of detention, conditions of detention, and alternative interrogation techniques, that is classified at the TOP SECRET//SCI level.

<u>The Damage to the National Security</u>

11. The President made clear in his speech that operation of the secret CIA detention program will continue. In order to fully appreciate the risk to the national security that disclosure of the operational details of the program would pose, the Court must first understand the importance of the program to the national security. Information obtained from the program has provided the U.S. Government with one of the most useful tools in combating terrorist threats to the national security. It has shed light on probable targets and likely methods for attacks on the United States, and has led to the

disruption of terrorist plots against the United States and its allies. Information obtained from the program has also played a role in the capture and questioning of additional senior al Qaeda operatives.

12. One of the most critical tools in the war against al Qaeda and its affiliates is the close intelligence relationships that the United States maintains with allies around the world. Many countries take great risks in order to assist the United States, and they do so with the explicit agreement that the nature of their assistance will remain secret. Should operational details about the program be improperly disclosed, such as the locations of CIA detention facilities, it would put our allies at risk of terrorist retaliation and betray relationships that are built on trust and are vital to our efforts against terrorism.

13. Improper disclosure of details regarding the conditions of detention and specific alternative interrogation procedures could also cause exceptionally grave consequences. Many terrorist operatives are specifically trained in counter-interrogation techniques. If specific alternative techniques were disclosed, it would permit terrorist organizations to adapt their training to counter the tactics that CIA can employ in interrogations. If detainees in the CIA program are more fully prepared to resist interrogation, it could prevent the CIA from obtaining vital intelligence that could disrupt future planned attacks.

### The Inadequacy of the Standard Protective Order Used in Previous Cases

14. The very purpose of a protective order is to establish the procedures that are to be followed by petitioner's counsel, translators for the parties, and various other individuals who will receive access to potentially classified national security information. The protective order that petitioner requests the Court to adopt contemplates that the

national security information at issue would be classified at the SECRET level, rather than at the TOP SECRET//SCI level as it is here. As such, the standard protective order used in previous detainee habeas cases fails, on its face, to adequately protect the national security information that may arise in this case.

15. By way of specific example, the protective order proposed by petitioner requires petitioners' counsel to hold a valid United States security clearance at only the SECRET level. Similarly, it does not require other individuals who may have access to potentially classified information provided by a detainee, such as translators, to possess clearances above the SECRET level. To adequately protect TOP SECRET//SCI information potentially provided by a detainee, access to such information would have to be restricted to individuals with TOP SECRET// SCI security clearances who have received briefings regarding the security procedures, signed a non-disclosure agreement, and been determined to have a need-to-know[2] the information at issue. In addition, the protective order proposed by petitioner permits procedures for handling and controlling potentially classified information that may be permissible for SECRET information, but is expressly prohibited for TOP SECRET//SCI. For example, information classified at the SECRET level may be transmitted via certified mail, a procedure that is prohibited for our nation's most guarded secrets at the TOP SECRET//SCI level. Similarly, documents at the SECRET level may be stored in a facility with fewer security devices than information at the TOP SECRET//SCI level. A protective order that allows individuals without the necessary security clearances access to TOP SECRET//SCI information, or permits the use of procedures not appropriate for TOP SECRET//SCI

---

[2] Executive Order 12958, as amended, defines "need-to-know" as a "determination by an authorized holder of classified information that a prospective recipient requires access to classified information in order to perform or assist in a lawful and authorized governmental function."

information, cannot possibly begin to adequately protect such information from unauthorized disclosure. Moreover, such procedures would explicitly violate the safeguarding requirements prescribed to protect classified information in Executive Order 12958, Part 4, as amended.

### Conclusion

16. I have determined that Majid Kahn may have come into possession of national security information that is classified at the TOP SECRET// SCI level. I have also determined that handling of such information under the standard protective order used in previous cases poses an unacceptable risk of disclosure, which reasonably could be expected to cause extremely grave damage to the national security.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of October, 2006.

Marilyn A. Dorn
Information Review Officer
National Clandestine Service
Central Intelligence Agency

**EXHIBIT  2**





For Immediate Release
Office of the Press Secretary
September 6, 2006

## President Discusses Creation of Military Commissions to Try Suspected Terrorists

The East Room

Fact Sheet: The Administration's Legislation to Create Military Commissions
Myth/Fact: The Administration's Legislation to Create Military Commissions
Fact Sheet: Bringing Terrorists to Justice

In Focus: National Security
en Español



President's Remarks
view

1:45 P.M. EDT

THE PRESIDENT: Thank you. Thanks for the warm welcome. Welcome to the White House. Mr. Vice President, Secretary Rice, Attorney General Gonzales, Ambassador Negroponte, General Hayden, members of the United States Congress, families who lost loved ones in the terrorist attacks on our nation, and my fellow citizens: Thanks for coming.

On the morning of September the 11th, 2001, our nation awoke to a nightmare attack. Nineteen men, armed with box cutters, took control of airplanes and turned them into missiles. They used them to kill nearly 3,000 innocent people. We watched the Twin Towers collapse before our eyes -- and it became instantly clear that we'd entered a new world, and a dangerous new war.

The attacks of September the 11th horrified our nation. And amid the grief came new fears and urgent questions: Who had attacked us? What did they want? And what else were they planning? Americans saw the destruction the terrorists had caused in New York, and Washington, and Pennsylvania, and they wondered if there were other terrorist cells in our midst poised to strike; they wondered if there was a second wave of attacks still to come.

With the Twin Towers and the Pentagon still smoldering, our country on edge, and a stream of intelligence coming in about potential new attacks, my administration faced immediate challenges: We had to respond to the attack on our country. We had to wage an unprecedented war against an enemy unlike any we had fought before. We had to find the terrorists hiding in America and across the world, before they were able to strike our country again. So in the early days and weeks after 9/11, I directed our government's senior national security officials to do everything in their power, within our laws, to prevent another attack.

Nearly five years have passed since these -- those initial days of shock and sadness -- and we are thankful that the terrorists have not succeeded in launching another attack on our soil. This is not for the lack of desire or determination on the part of the enemy. As the recently foiled plot in London shows, the terrorists are still active, and they're still trying to strike America, and they're still trying to kill our people. One reason the terrorists have not succeeded is because of the hard work of thousands of dedicated men and women in our government, who have toiled day and night, along with our allies, to stop the enemy from carrying out their plans. And we are grateful for these hardworking citizens of ours.

Another reason the terrorists have not succeeded is because our government has changed its policies -- and given our military, intelligence, and law enforcement personnel the tools they need to fight this enemy and

protect our people and preserve our freedoms.



The terrorists who declared war on America represent no nation, they defend no territory, and they wear no uniform. They do not mass armies on borders, or flotillas of warships on the high seas. They operate in the shadows of society; they send small teams of operatives to infiltrate free nations; they live quietly among their victims; they conspire in secret, and then they strike without warning. In this new war, the most important source of information on where the terrorists are hiding and what they are planning is the terrorists, themselves. Captured terrorists have unique knowledge about how terrorist networks operate. They have knowledge of where their operatives are deployed, and knowledge about what plots are underway. This intelligence -- this is intelligence that cannot be found any other place. And our security depends on getting this kind of information. To win the war on terror, we must be able to detain, question, and, when appropriate, prosecute terrorists captured here in America, and on the battlefields around the world.

After the 9/11 attacks, our coalition launched operations across the world to remove terrorist safe havens, and capture or kill terrorist operatives and leaders. Working with our allies, we've captured and detained thousands of terrorists and enemy fighters in Afghanistan, in Iraq, and other fronts of this war on terror. These enemy -- these are enemy combatants, who were waging war on our nation. We have a right under the laws of war, and we have an obligation to the American people, to detain these enemies and stop them from rejoining the battle.

Most of the enemy combatants we capture are held in Afghanistan or in Iraq, where they're questioned by our military personnel. Many are released after questioning, or turned over to local authorities -- if we determine that they do not pose a continuing threat and no longer have significant intelligence value. Others remain in American custody near the battlefield, to ensure that they don't return to the fight.

In some cases, we determine that individuals we have captured pose a significant threat, or may have intelligence that we and our allies need to have to prevent new attacks. Many are al Qaeda operatives or Taliban fighters trying to conceal their identities, and they withhold information that could save American lives. In these cases, it has been necessary to move these individuals to an environment where they can be held secretly [sic], questioned by experts, and -- when appropriate -- prosecuted for terrorist acts.



Some of these individuals are taken to the United States Naval Base at Guantanamo Bay, Cuba. It's important for Americans and others across the world to understand the kind of people held at Guantanamo. These aren't common criminals, or bystanders accidentally swept up on the battlefield -- we have in place a rigorous process to ensure those held at Guantanamo Bay belong at Guantanamo. Those held at Guantanamo include suspected bomb makers, terrorist trainers, recruiters and facilitators, and potential suicide bombers. They are in our custody so they cannot murder our people. One detainee held at Guantanamo told a questioner questioning him -- he said this: "I'll never forget your face. I will kill you, your brothers, your mother, and sisters."

In addition to the terrorists held at Guantanamo, a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency. This group includes individuals believed to be the key architects of the September the 11th attacks, and attacks on the USS Cole, an operative involved in the bombings of our embassies in Kenya and Tanzania, and individuals involved in other attacks that have taken the lives of innocent civilians across the world. These are dangerous men with unparalleled knowledge about terrorist networks and their plans for new attacks. The security of our nation and the lives of our citizens depend on our ability to learn what these terrorists know.

Many specifics of this program, including where these detainees have been held and the details of their confinement, cannot be divulged. Doing so would provide our enemies with information they could use to take retribution against our allies and harm our country. I can say that questioning the detainees in this program has given us information that has saved innocent lives by helping us stop new attacks -- here in the United States

and across the world. Today, I'm going to share with you some of the examples provided by our intelligence community of how this program has saved lives; why it remains vital to the security of the United States, and our friends and allies; and why it deserves the support of the United States Congress and the American people.

Within months of September the 11th, 2001, we captured a man known as Abu Zubaydah. We believe that Zubaydah was a senior terrorist leader and a trusted associate of Osama bin Laden. Our intelligence community believes he had run a terrorist camp in Afghanistan where some of the 9/11 hijackers trained, and that he helped smuggle al Qaeda leaders out of Afghanistan after coalition forces arrived to liberate that country. Zubaydah was severely wounded during the firefight that brought him into custody -- and he survived only because of the medical care arranged by the CIA.

After he recovered, Zubaydah was defiant and evasive. He declared his hatred of America. During questioning, he at first disclosed what he thought was nominal information -- and then stopped all cooperation. Well, in fact, the "nominal" information he gave us turned out to be quite important. For example, Zubaydah disclosed Khalid Sheikh Mohammed -- or KSM -- was the mastermind behind the 9/11 attacks, and used the alias "Muktar." This was a vital piece of the puzzle that helped our intelligence community pursue KSM. Abu Zubaydah also provided information that helped stop a terrorist attack being planned for inside the United States -- an attack about which we had no previous information. Zubaydah told us that al Qaeda operatives were planning to launch an attack in the U.S., and provided physical descriptions of the operatives and information on their general location. Based on the information he provided, the operatives were detained -- one while traveling to the United States.

We knew that Zubaydah had more information that could save innocent lives, but he stopped talking. As his questioning proceeded, it became clear that he had received training on how to resist interrogation. And so the CIA used an alternative set of procedures. These procedures were designed to be safe, to comply with our laws, our Constitution, and our treaty obligations. The Department of Justice reviewed the authorized methods extensively and determined them to be lawful. I cannot describe the specific methods used -- I think you understand why -- if I did, it would help the terrorists learn how to resist questioning, and to keep information from us that we need to prevent new attacks on our country. But I can say the procedures were tough, and they were safe, and lawful, and necessary.

Zubaydah was questioned using these procedures, and soon he began to provide information on key al Qaeda operatives, including information that helped us find and capture more of those responsible for the attacks on September the 11th. For example, Zubaydah identified one of KSM's accomplices in the 9/11 attacks -- a terrorist named Ramzi bin al Shibh. The information Zubaydah provided helped lead to the capture of bin al Shibh. And together these two terrorists provided information that helped in the planning and execution of the operation that captured Khalid Sheikh Mohammed.

Once in our custody, KSM was questioned by the CIA using these procedures, and he soon provided information that helped us stop another planned attack on the United States. During questioning, KSM told us about another al Qaeda operative he knew was in CIA custody -- a terrorist named Majid Khan. KSM revealed that Khan had been told to deliver $50,000 to individuals working for a suspected terrorist leader named Hambali, the leader of al Qaeda's Southeast Asian affiliate known as "J-I". CIA officers confronted Khan with this information. Khan confirmed that the money had been delivered to an operative named Zubair, and provided both a physical description and contact number for this operative.

Based on that information, Zubair was captured in June of 2003, and he soon provided information that helped lead to the capture of Hambali. After Hambali's arrest, KSM was questioned again. He identified Hambali's brother as the leader of a "J-I" cell, and Hambali's conduit for communications with al Qaeda. Hambali's brother was soon captured in Pakistan, and, in turn, led us to a cell of 17 Southeast Asian "J-I" operatives. When confronted with the news that his terror cell had been broken up, Hambali admitted that the operatives were being groomed at KSM's request for attacks inside the United States -- probably [sic] using airplanes.

During questioning, KSM also provided many details of other plots to kill innocent Americans. For example, he described the design of planned attacks on buildings inside the United States, and how operatives were directed to carry them out. He told us the operatives had been instructed to ensure that the explosives went off at a point that was high enough to prevent the people trapped above from escaping out the windows.

KSM also provided vital information on al Qaeda's efforts to obtain biological weapons. During questioning, KSM admitted that he had met three individuals involved in al Qaeda's efforts to produce anthrax, a deadly biological

agent -- and he identified one of the individuals as a terrorist named Yazid. KSM apparently believed we already had this information, because Yazid had been captured and taken into foreign custody before KSM's arrest. In fact, we did not know about Yazid's role in al Qaeda's anthrax program. Information from Yazid then helped lead to the capture of his two principal assistants in the anthrax program. Without the information provided by KSM and Yazid, we might not have uncovered this al Qaeda biological weapons program, or stopped this al Qaeda cell from developing anthrax for attacks against the United States.

These are some of the plots that have been stopped because of the information of this vital program. Terrorists held in CIA custody have also provided information that helped stop a planned strike on U.S. Marines at Camp Lemonier in Djibouti -- they were going to use an explosive laden water tanker. They helped stop a planned attack on the U.S. consulate in Karachi using car bombs and motorcycle bombs, and they helped stop a plot to hijack passenger planes and fly them into Heathrow or the Canary Wharf in London.

We're getting vital information necessary to do our jobs, and that's to protect the American people and our allies.

Information from the terrorists in this program has helped us to identify individuals that al Qaeda deemed suitable for Western operations, many of whom we had never heard about before. They include terrorists who were set to case targets inside the United States, including financial buildings in major cities on the East Coast. Information from terrorists in CIA custody has played a role in the capture or questioning of nearly every senior al Qaeda member or associate detained by the U.S. and its allies since this program began. By providing everything from initial leads to photo identifications, to precise locations of where terrorists were hiding, this program has helped us to take potential mass murderers off the streets before they were able to kill.

This program has also played a critical role in helping us understand the enemy we face in this war. Terrorists in this program have painted a picture of al Qaeda's structure and financing, and communications and logistics. They identified al Qaeda's travel routes and safe havens, and explained how al Qaeda's senior leadership communicates with its operatives in places like Iraq. They provided information that allows us -- that has allowed us to make sense of documents and computer records that we have seized in terrorist raids. They've identified voices in recordings of intercepted calls, and helped us understand the meaning of potentially critical terrorist communications.

The information we get from these detainees is corroborated by intelligence, and we've received -- that we've received from other sources -- and together this intelligence has helped us connect the dots and stop attacks before they occur. Information from the terrorists questioned in this program helped unravel plots and terrorist cells in Europe and in other places. It's helped our allies protect their people from deadly enemies. This program has been, and remains, one of the most vital tools in our war against the terrorists. It is invaluable to America and to our allies. Were it not for this program, our intelligence community believes that al Qaeda and its allies would have succeeded in launching another attack against the American homeland. By giving us information about terrorist plans we could not get anywhere else, this program has saved innocent lives.

This program has been subject to multiple legal reviews by the Department of Justice and CIA lawyers; they've determined it complied with our laws. This program has received strict oversight by the CIA's Inspector General. A small number of key leaders from both political parties on Capitol Hill were briefed about this program. All those involved in the questioning of the terrorists are carefully chosen and they're screened from a pool of experienced CIA officers. Those selected to conduct the most sensitive questioning had to complete more than 250 additional hours of specialized training before they are allowed to have contact with a captured terrorist.

I want to be absolutely clear with our people, and the world: The United States does not torture. It's against our laws, and it's against our values. I have not authorized it -- and I will not authorize it. Last year, my administration worked with Senator John McCain, and I signed into law the Detainee Treatment Act, which established the legal standard for treatment of detainees wherever they are held. I support this act. And as we implement this law, our government will continue to use every lawful method to obtain intelligence that can protect innocent people, and stop another attack like the one we experienced on September the 11th, 2001.

The CIA program has detained only a limited number of terrorists at any given time -- and once we've determined that the terrorists held by the CIA have little or no additional intelligence value, many of them have been returned to their home countries for prosecution or detention by their governments. Others have been accused of terrible crimes against the American people, and we have a duty to bring those responsible for these crimes to justice. So we intend to prosecute these men, as appropriate, for their crimes.

Soon after the war on terror began, I authorized a system of military commissions to try foreign terrorists accused of war crimes. Military commissions have been used by Presidents from George Washington to Franklin Roosevelt to prosecute war criminals, because the rules for trying enemy combatants in a time of conflict must be different from those for trying common criminals or members of our own military. One of the first suspected terrorists to be put on trial by military commission was one of Osama bin Laden's bodyguards -- a man named Hamdan. His lawyers challenged the legality of the military commission system. It took more than two years for this case to make its way through the courts. The Court of Appeals for the District of Columbia Circuit upheld the military commissions we had designed, but this past June, the Supreme Court overturned that decision. The Supreme Court determined that military commissions are an appropriate venue for trying terrorists, but ruled that military commissions needed to be explicitly authorized by the United States Congress.

So today, I'm sending Congress legislation to specifically authorize the creation of military commissions to try terrorists for war crimes. My administration has been working with members of both parties in the House and Senate on this legislation. We put forward a bill that ensures these commissions are established in a way that protects our national security, and ensures a full and fair trial for those accused. The procedures in the bill I am sending to Congress today reflect the reality that we are a nation at war, and that it's essential for us to use all reliable evidence to bring these people to justice.

We're now approaching the five-year anniversary of the 9/11 attacks -- and the families of those murdered that day have waited patiently for justice. Some of the families are with us today -- they should have to wait no longer. So I'm announcing today that Khalid Sheikh Mohammed, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in CIA custody have been transferred to the United States Naval Base at Guantanamo Bay. (Applause.) They are being held in the custody of the Department of Defense. As soon as Congress acts to authorize the military commissions I have proposed, the men our intelligence officials believe orchestrated the deaths of nearly 3,000 Americans on September the 11th, 2001, can face justice. (Applause.)

We'll also seek to prosecute those believed to be responsible for the attack on the USS Cole, and an operative believed to be involved in the bombings of the American embassies in Kenya and Tanzania. With these prosecutions, we will send a clear message to those who kill Americans: No longer -- how long it takes, we will find you and we will bring you to justice. (Applause.)

These men will be held in a high-security facility at Guantanamo. The International Committee of the Red Cross is being advised of their detention, and will have the opportunity to meet with them. Those charged with crimes will be given access to attorneys who will help them prepare their defense -- and they will be presumed innocent. While at Guantanamo, they will have access to the same food, clothing, medical care, and opportunities for worship as other detainees. They will be questioned subject to the new U.S. Army Field Manual, which the Department of Defense is issuing today. And they will continue to be treated with the humanity that they denied others.

As we move forward with the prosecutions, we will continue to urge nations across the world to take back their nationals at Guantanamo who will not be prosecuted by our military commissions. America has no interest in being the world's jailer. But one of the reasons we have not been able to close Guantanamo is that many countries have refused to take back their nationals held at the facility. Other countries have not provided adequate assurances that their nationals will not be mistreated -- or they will not return to the battlefield, as more than a dozen people released from Guantanamo already have. We will continue working to transfer individuals held at Guantanamo, and ask other countries to work with us in this process. And we will move toward the day when we can eventually close the detention facility at Guantanamo Bay.

I know Americans have heard conflicting information about Guantanamo. Let me give you some facts. Of the thousands of terrorists captured across the world, only about 770 have ever been sent to Guantanamo. Of these, about 315 have been returned to other countries so far -- and about 455 remain in our custody. They are provided the same quality of medical care as the American service members who guard them. The International Committee of the Red Cross has the opportunity to meet privately with all who are held there. The facility has been visited by government officials from more than 30 countries, and delegations from international organizations, as well. After the Organization for Security and Cooperation in Europe came to visit, one of its delegation members called Guantanamo "a model prison" where people are treated better than in prisons in his own country. Our troops can take great pride in the work they do at Guantanamo Bay -- and so can the American people.

As we prosecute suspected terrorist leaders and operatives who have now been transferred to Guantanamo, we'll continue searching for those who have stepped forward to take their places. This nation is going to stay on the offense to protect the American people. We will continue to bring the world's most dangerous terrorists to justice -- and we will continue working to collect the vital intelligence we need to protect our country. The current transfers mean that there are now no terrorists in the CIA program. But as more high-ranking terrorists are captured, the need to obtain intelligence from them will remain critical -- and having a CIA program for questioning terrorists will continue to be crucial to getting life-saving information.

Some may ask: Why are you acknowledging this program now? There are two reasons why I'm making these limited disclosures today. First, we have largely completed our questioning of the men -- and to start the process for bringing them to trial, we must bring them into the open. Second, the Supreme Court's recent decision has impaired our ability to prosecute terrorists through military commissions, and has put in question the future of the CIA program. In its ruling on military commissions, the Court determined that a provision of the Geneva Conventions known as "Common Article Three" applies to our war with al Qaeda. This article includes provisions that prohibit "outrages upon personal dignity" and "humiliating and degrading treatment." The problem is that these and other provisions of Common Article Three are vague and undefined, and each could be interpreted in different ways by American or foreign judges. And some believe our military and intelligence personnel involved in capturing and questioning terrorists could now be at risk of prosecution under the War Crimes Act -- simply for doing their jobs in a thorough and professional way.

This is unacceptable. Our military and intelligence personnel go face to face with the world's most dangerous men every day. They have risked their lives to capture some of the most brutal terrorists on Earth. And they have worked day and night to find out what the terrorists know so we can stop new attacks. America owes our brave men and women some things in return. We owe them our thanks for saving lives and keeping America safe. And we owe them clear rules, so they can continue to do their jobs and protect our people.

So today, I'm asking Congress to pass legislation that will clarify the rules for our personnel fighting the war on terror. First, I'm asking Congress to list the specific, recognizable offenses that would be considered crimes under the War Crimes Act -- so our personnel can know clearly what is prohibited in the handling of terrorist enemies. Second, I'm asking that Congress make explicit that by following the standards of the Detainee Treatment Act our personnel are fulfilling America's obligations under Common Article Three of the Geneva Conventions. Third, I'm asking that Congress make it clear that captured terrorists cannot use the Geneva Conventions as a basis to sue our personnel in courts -- in U.S. courts. The men and women who protect us should not have to fear lawsuits filed by terrorists because they're doing their jobs.

The need for this legislation is urgent. We need to ensure that those questioning terrorists can continue to do everything within the limits of the law to get information that can save American lives. My administration will continue to work with the Congress to get this legislation enacted -- but time is of the essence. Congress is in session just for a few more weeks, and passing this legislation ought to be the top priority. (Applause.)

As we work with Congress to pass a good bill, we will also consult with congressional leaders on how to ensure that the CIA program goes forward in a way that follows the law, that meets the national security needs of our country, and protects the brave men and women we ask to obtain information that will save innocent lives. For the sake of our security, Congress needs to act, and update our laws to meet the threats of this new era. And I know they will.

We're engaged in a global struggle -- and the entire civilized world has a stake in its outcome. America is a nation of law. And as I work with Congress to strengthen and clarify our laws here at home, I will continue to work with members of the international community who have been our partners in this struggle. I've spoken with leaders of foreign governments, and worked with them to address their concerns about Guantanamo and our detention policies. I'll continue to work with the international community to construct a common foundation to defend our nations and protect our freedoms.

Free nations have faced new enemies and adjusted to new threats before -- and we have prevailed. Like the struggles of the last century, today's war on terror is, above all, a struggle for freedom and liberty. The adversaries are different, but the stakes in this war are the same: We're fighting for our way of life, and our ability to live in freedom. We're fighting for the cause of humanity, against those who seek to impose the darkness of tyranny and terror upon the entire world. And we're fighting for a peaceful future for our children and our grandchildren.

May God bless you all. (Applause.)

END 2:22 P.M. EDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html



# EXHIBIT  3

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

MAJID KHAN,                      )
                                 )
            Petitioner,          )
                                 )
        v.                       )    No. 07-1324
                                 )
                                 )
ROBERT M. GATES,                 )
                                 )
            Respondent.          )
_____ )

**DECLARATION OF WENDY M. HILTON**
**ASSOCIATE INFORMATION REVIEW OFFICER**
**NATIONAL CLANDESTINE SERVICE**
**CENTRAL INTELLIGENCE AGENCY**

I, WENDY M. HILTON, hereby declare and say:

1.  I am an Associate Information Review Officer (AIRO) for
the National Clandestine Service (NCS) of the Central
Intelligence Agency (CIA).  I was appointed to this position in
March 2007.  I have held a variety of positions in the CIA since
I became a staff officer in 1983.

2.  The NCS is the organization within the CIA responsible
for conducting the CIA's foreign intelligence and
counterintelligence activities; conducting special activities,
including covert action; conducting liaison with foreign
intelligence and security services; serving as the repository
for foreign counterintelligence information; supporting

clandestine technical collection; and coordinating CIA support
to the Department of Defense.  Specifically, the NCS is
responsible for the conduct of foreign intelligence collection
activities through the clandestine use of human sources.

3.  As AIRO, I am authorized to assess the current, proper
classification of CIA information based on the classification
criteria of Executive Order 12958, as amended,[1] and applicable
CIA regulations.  As part of my official duties, I ensure that
determinations such as the release or withholding of information
related to the CIA are proper and do not jeopardize CIA
interests, personnel, or facilities, and, on behalf of the
Director of the CIA, do not jeopardize CIA intelligence
activities, sources, or methods.  I am able to describe, based
on my experience, the damage to the national security that
reasonably could be expected to result from the unauthorized
disclosure of classified information.

4.  Section 6.1 of Executive Order 12958 defines "national
security" as "the national defense or foreign relations of the
United States;" and defines "information" as "any knowledge that
can be communicated or documentary material, regardless of its
physical form or characteristics, that is owned by, produced by

---

[1] Executive Order 12958 was amended by Executive Order 13292.  See Exec. Order
No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).  All citations to Exec. Order
No. 12958 are to the Order as amended by Exec. Order No. 13292.  See Exec.
Order No. 12958, 3 C.F.R. 333 (1995), reprinted as amended in 50 U.S.C.A. §
435 note at 187 (West Supp. 2007).

or for, or is under the control of the United States

Government."

    5.   Section 1.1(a) of the Executive Order provides that

information may be originally classified under the terms of this

order only if the following conditions are met:

        (1)   an original classification authority is
    classifying the information;

        (2)   the information is owned by, produced by or for,
    or is under the control of the United States Government;

        (3)   the information falls within one or more of the
    categories of information listed in section 1.4 of this
    order; and

        (4)   The original classification authority determines
    that the unauthorized disclosure of the information
    reasonably could be expected to result in damage to the
    national security, which includes defense against
    transnational terrorism, and the original classification
    authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

    6.   Section 1.3(a) of the Executive Order provides that the

authority to classify information originally may be exercised

only by the President and, in the performance of executive

duties, the Vice President; agency heads and officials

designated by the President in the Federal Register; and United

States Government officials delegated this authority pursuant to

section 1.3(c) of the Order.  Section 1.3(c)(2) provides that

TOP SECRET original classification authority may be delegated

only by the President; in the performance of executive duties,

                                3

the Vice President; or an agency head or official designated
pursuant to section 1.3(a)(2) of the Executive Order.

7.    In accordance with section 1.3(a)(2), the President
designated the Director of the CIA as an official who may
classify information originally as TOP SECRET.[2]   Under the
authority of section 1.3(c)(2), the Director of the CIA has
delegated original TOP SECRET classification authority to me.
Section 1.3(b) of the Executive Order provides that original TOP
SECRET classification authority includes the authority to
classify information originally as SECRET and CONFIDENTIAL.    I
am authorized, therefore, to conduct classification reviews and
to make original classification and declassification decisions
regarding national security information.

8.    Section 102(A)(i) of the National Security Act of 1947,
as amended, 50 U.S.C. § 403-1(i), requires the Director of
National Intelligence (DNI) to protect intelligence sources and
methods from unauthorized disclosure.  As explained below,
petitioner Majid Khan has been exposed to intelligence sources
and methods that the DNI is required to protect from
unauthorized disclosure.  For this reason, the DNI authorized me
to take all necessary and appropriate measures in this case to
ensure that intelligence sources and methods are protected from

---

[2] Order of President, Designation under Executive Order 12958, 70 Fed. Reg.
21,609 (Apr. 21, 2005), *reprinted in* U.S.C.A. § 435 note at 199 (West Supp.
2007).

4

public disclosure.  Under this authorization of the DNI and in

accordance with section 6 of the Central Intelligence Agency Act

of 1949, as amended, 50 U.S.C.A. § 403g, and sections 1.3(a)(5)

and 1.5(h) of Executive Order 12333, the DCIA is responsible for

protecting CIA sources and methods from unauthorized disclosure.

9.  I make the following statements based upon my personal

knowledge and information made available to me in my official

capacity.

10.  Through the exercise of my official duties, I am

generally familiar with this case.  I understand that Petitioner

has filed a Petition under the Detainee Treatment Act (DTA)

challenging the determination by the Department of Defense (DOD)

that Petitioner should continue to be detained as an enemy

combatant at Guantanamo Bay, Cuba.  I also understand that a

protective order was entered by the Court on 12 October 2007.  I

have reviewed in their entirety Petitioner's Motion for

Preservation of Torture Evidence and Motion to Declare

Interrogation Methods Applied Against Petitioner Torture and all

accompanying exhibits to these motions.  I understand that The

New York Times Company, the Associated Press, and USA Today have

filed a motion to unseal certain classified filings made in this

case.  The purpose of this declaration is to describe for the

Court the damage to the national security that reasonably could

be expected to result if the classified information in these
filings is unsealed.

11. Petitioner and the fifteen other high-value detainees
at Guantanamo Bay formerly held in CIA custody (HVDs)[3] have been
exposed to intelligence sources and methods. In addition to
being protected from disclosure under the National Security Act
of 1947 and the Central Intelligence Agency Act of 1949, these
sources and methods also are classified information the
disclosure of which reasonably could be expected to result in
exceptionally grave damage to the national security.
Specifically, the locations of CIA intelligence activities
overseas, the assistance provided by certain foreign governments
in furtherance of those activities, and the conditions of
confinement and interrogation methods used by the CIA are all
properly classified intelligence sources and methods. Part I of
this declaration describes the intelligence activities
implicated in this case and the exceptionally grave damage to
national security that reasonably could be expected to result if
Petitioner's classified statements about these intelligence
sources and methods are publicly disclosed. Part II of this
declaration describes the extraordinary measures the U.S.
Government has taken to ensure that the classified information

---

[3] On September 6, 2006, the President announced that fourteen detainees who
had been held in CIA custody had been transferred to Department of Defense
custody at Guantanamo Bay, Cuba. Two additional detainees were later
transferred to Guantanamo Bay from CIA custody.

6

to which the HVDs have been exposed is protected against
unauthorized disclosure.

## I.   Damage to National Security Resulting from Public
Disclosure of Petitioner's Statements about CIA
Intelligence Activities

12.   Public disclosure of the classified information to
which Petitioner has been exposed reasonably could be expected
to cause exceptionally grave damage to the national security.
Specifically, disclosure of such information is reasonably
likely to damage the CIA's relationships with foreign
intelligence and security services and thereby degrade the CIA's
ability to effectively question terrorist detainees and elicit
information necessary to protect the American people.

### A.   Damage to Foreign Relations

13.   Among the most critical sources and methods in the
collection of foreign intelligence are the relationships that
the United States maintains with the intelligence and security
services of foreign countries.  Through these intelligence
liaison relationships, the CIA can collect intelligence and
provide to U.S. national security and foreign policy officials
information that is critical to informed decision making;
information that the CIA cannot obtain through other sources and
methods.

14.   In this case, foreign governments have provided
critical assistance to CIA counterterrorism operations,

7

including but not limited to hosting of foreign detention

facilities, under the condition that their assistance be kept

secret.    Statements from Petitioner and other HVDs acknowledged

to have been in the CIA's detention program about the specific

foreign detention locations and other critical assistance that

foreign countries have provided to the CIA's counterterrorism

operations would damage the CIA's relations with these foreign

governments and could cause them to cease cooperating with the

CIA on such matters.    If the United States demonstrates that it

is unwilling or unable to stand by its commitments to foreign

governments, they will be less willing to cooperate with the

United States on counterterrorism activities.

15.    The damage to national security that could result if

Petitioner and other HVDs were permitted to discuss their

knowledge about foreign cooperation is not merely conjectural.

Just prior to the President's 6 September 2006 speech announcing

the transfer of HVDs to DOD custody, the CIA provided certain

foreign partners specific assurances that the CIA would protect

their cooperation.    These liaison partners expressed their deep

appreciation and highlighted that their continued cooperation

was conditioned on the CIA's commitment and ability to keep

their assistance strictly confidential.

16.    Specifically, one particular liaison partner reduced

its cooperation with the CIA when its role in the terrorist

8

detention program leaked to a third country whose national had been detained within the program. The liaison partner lost the trust and cooperation of that third country in matters of their own national security. Repair of the CIA's relationship with this liaison partner came only through the senior-level intervention of the CIA Director personally apologizing for the leak. Despite this significant effort, to this day the damage this one incident has caused to the CIA's relationship with the liaison partner is incalculable, as the CIA can never be sure to what extent the liaison partner is withholding vital intelligence necessary to the national security of the United States. Accordingly, Petitioner's and other HVDs' disclosures concerning foreign cooperation would have a lasting negative impact by frustrating CIA efforts to obtain vital national security information required to protect the American people.

B.    Damage to CIA Intelligence Activities

17.    Petitioner and other HVDs have been exposed to classified intelligence methods, including the CIA's methods of questioning, conditions of confinement while in CIA custody, and certain intelligence disclosed during the course of questioning. Public disclosure of such information reasonably could be expected to cause exceptionally grave damage to national security by making it more difficult for the CIA to obtain the information it needs to help protect the American people.

9

18.    As the President has acknowledged in his speech of September 6, 2006 announcing the transfer of the HVDs to Guantanamo Bay, the CIA is authorized to use alternative procedures in the questioning of certain terrorist detainees. He also stated, however, that the details of their confinement and the methods of their interrogation could not be divulged and that he intended that the CIA program continue. Unauthorized disclosures regarding the specifics of the detention and interrogation program, including the techniques the CIA uses to elicit information, are likely to degrade the program's effectiveness and therefore result in exceptionally grave damage to the national security.

19.    The CIA's detention program has provided the U.S. Government with one of the most useful tools in combating terrorist threats to the national security. It has shed light on probable targets and likely methods for attacks on the United States, and has led to the disruption of terrorist plots against the United States and its allies. For example, information obtained through the program thwarted a plot to fly a plane into the tallest building in Los Angeles. Additional plots that were disrupted included hijacking passenger planes to fly into Heathrow Airport and the Canary Wharf in London and attacking the U.S. consulate in Karachi, Pakistan, using car bombs and motorcycle bombs.

10

20. Additionally, information obtained through the program also has played a vital role in the capture and questioning of additional senior al Qaeda operatives. For example, interrogations of detainees produced information that provided initial leads to the locations of al Qaeda operatives that led to their capture. In addition, the United States gained valuable information that explained previously unknown details of al Qaeda, such as its organization, financing, communications, and logistics.

21. The U.S. Government is aware that al Qaeda and other terrorists train in counter-interrogation methods. Public disclosure of the methods used by the CIA would allow al Qaeda and other terrorists to more effectively train to resist such techniques, which would result in degradation in the effectiveness of the techniques in the future.

## C.  Allegations Regarding the CIA Detention Program by Persons other than High-Value Detainees

22. I am aware of media speculation about the supposed locations of CIA detention facilities and the techniques that the CIA is allegedly authorized to use during the interrogation of terrorist detainees. I also am aware that persons other than Petitioner and the HVDs at Guantanamo Bay, Cuba, have made allegations about detention and mistreatment by the CIA and foreign governments assisting the CIA. In none of those cases,

11

however, has the U.S. Government acknowledged whether the information in the media is correct or whether such persons were ever held in the CIA detention program.[4]

23. In contrast, the U.S. Government has acknowledged publicly that Petitioner and the other HVDs were held in the CIA's detention program and that at least some were subjected to alternative interrogation techniques. The U.S. Government has acknowledged, therefore, that the Petitioner and other HVDs may have come into possession of the very information about the CIA program that the U.S. Government seeks to protect, including the locations of detention facilities, the identities of cooperating foreign governments, and the conditions of confinement and interrogations techniques. If the U.S. Government allows anything Petitioner says about the program to be publicly disclosed, then Petitioner and other HVDs will be in a position to make truthful unauthorized disclosures about such activities. Terrorists could then rely on such disclosures by Petitioner and other HVDs and would exploit such disclosures to improve their counter-interrogation training. Additionally, allowing such

---

[4] Media speculation about details of detainee interrogations does not thereby render the information unclassified. In terms of the potential impact upon the intelligence activities and foreign relations of the United States, there is a critical distinction between unsubstantiated information circulating in the press and official government release or acknowledgement of such information. The U.S. Government must be able to maintain the distinction between media reports--which may or may not be accurate--by individuals not authorized to speak on behalf of the United States, and official disclosures. Unauthorized public statements do not affect the status of properly classified information.

12

disclosures by Petitioner would violate our secrecy agreement with foreign countries, making them less willing to assist the CIA with this program and other counterterrorism operations.

D.  False Allegations by High-Value Detainees

24.  I recognize that many of the allegations that Petitioner has made about the CIA's detention program are untrue.  Notwithstanding this, Petitioner and each of the HVDs is in a position to provide accurate and detailed information about the CIA's detention program.  As already stated, the disclosure of such details reasonably could be expected to result in exceptionally grave damage to national security.

25.  False or exaggerated allegations by the detainees about the classified details of the program, however, also must be treated as classified information because a different rule would have the effect of allowing accurate, highly classified information about the program to be revealed by Petitioner and other HVDs.  If a rule to redact only truthful statements were established, a detainee with knowledge of classified facts could easily manipulate the rule to reveal those classified facts. Thus, for example, if the United States redacted only Petitioner's true allegations regarding locations of CIA detention facilities, the true locations of these facilities could be revealed by making multiple allegations as to location, through a simple process of elimination.  The same is true with

13

respect to conditions of confinement and interrogation methods.
If only true statements about such conditions and techniques are
redacted, detainees who have access to classified information
regarding actual conditions and techniques could paint a picture
of those conditions and techniques used and not used by making
repeated allegations about conditions of confinement and
interrogation techniques.  In sum, the continued success of the
interrogation program depends as much on concealing what
interrogation methods are not approved as it does on concealing
what methods are approved.[5]

26.  A rule that allows Petitioner and other HVDs to speak
freely about the CIA program will allow them to directly reveal
the classified information about the program that the Government
must protect.  A rule that redacts only true statements that
Petitioner makes about the program allows Petitioner and other
detainees to manipulate the rule to reveal the true details of
the program.  Therefore, in order to protect the classified
facts at issue here--the details of the CIA terrorist detention
and interrogation program--the U.S. Government must treat all
allegations by Petitioner and the other HVDs regarding the
program as classified.

---

[5] Recently the Director of the CIA publicly acknowledged that the CIA has used
waterboarding as an interrogation technique.  Section 3.1(b) of Executive
Order 12958, as amended, authorizes certain Executive officials to determine
whether the need to protect classified information is outweighed by the
public interest in disclosure.

14

**II.  U.S. Government Measures Taken to Protect this Information**

27.  Recognizing the damage to national security that
reasonably could be expected to result if this information were
publicly disclosed, the U.S. Government has instituted
extraordinary security arrangements for the protection of this
information.  Information relating to the CIA terrorist
detention and interrogation program has been placed in a tightly
compartmented TOP SECRET//SCI Program in order to minimize the
number of people who have access to the information and thereby
lessen the risk of unauthorized disclosure.[6]

28.  Several additional requirements also have been
established since the detainees arrived at Guantanamo Bay, Cuba.
These requirements, although burdensome and expensive for the
U.S. Government, are necessary for the protection of national
security.  First, all U.S. Government personnel who have
substantive contact with the HVDs must possess appropriate

---

[6] Under Executive Order 12958, as amended, the anticipated severity of the
damage to the national security resulting from disclosure determines which of
three classification levels is applied to the information.  Thus, if an
unauthorized disclosure of information reasonably could be expected to cause
*damage* to the national security, that information may be classified as
CONFIDENTIAL; *serious damage* may be classified as SECRET; and *exceptionally
grave damage* may be classified as TOP SECRET.  Section 4.3 of Executive Order
12958, as amended, provides that specified officials may create special
access programs upon a finding that the vulnerability of, or threat to,
specific information is exceptional, and the normal criteria for determining
eligibility for access applicable to information classified at the same level
are not deemed sufficient to protect the information from unauthorized
disclosure.  Special access programs relating to intelligence activities or
intelligence sources or methods are called Sensitive Compartmented
Information (SCI) Programs.

security clearances.[7]  Second, all work done by U.S. Government personnel that relates to information provided by the HVDs must be conducted on approved secure computer systems.  Third, all documents derived from the statements of HVDs must be treated as classified and handled and stored appropriately.  Fourth, HVD mail is monitored and redacted for national security purposes before it is released from Guantanamo Bay, Cuba.  And finally, individuals interviewing the detainees, including law enforcement personnel, DOD personnel associated with the Combatant Status Review Tribunal Process, and counsel for detainees have been required to obtain a TOP SECRET//SCI security approval before being allowed access to the HVDs.

**III.  Conclusion**

29.  I have determined that Petitioner has been exposed to sensitive national security information that is classified at the TOP SECRET//SCI level.  Due to the President's public acknowledgement that Petitioner was previously held by the CIA, his statements regarding the CIA terrorist detention and interrogation program must continue to be protected from public disclosure.  For the reasons described above, details regarding the operation of the CIA program remain classified at the TOP SECRET//SCI level.

---

[7] Pursuant to Department of Defense policy, the International Committee of the Red Cross has had access to the HVDs because the ICRC works confidentially with the U.S. Government.

16

                              *   *   *   *

     I hereby declare under penalty of perjury that the

foregoing is true and correct.

     Executed this 28th day of March, 2008.

                              _Wendy M. Hilton_
                              Wendy M. Hilton
                              Associate Information Review Officer
                              National Clandestine Service
                              Central Intelligence Agency

                                   17